ROBERT E. FOXE AND MARY M. FOXE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3691–67.   Filed October 8, 1969.

*Gino P. Cecchi*, for the petitioners.
*Jeffrey E. Boly*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

| *TYE Dec. 31—* | *Deficiency* |
| --- | --- |
| 1961 | $3, 342. 85 |
| 1962 | 2, 268. 03 |
| 1963 | 1, 442. 16 |
| 1964 | 1, 444. 20 |

The issue remaining for decision is whether certain amounts received by the petitioner in consideration of the termination of his employment contract with Constitution Life Insurance Co. are taxable as ordinary income or as gain from the sale or exchange of a capital asset.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

Robert E. Foxe and Mary M. Foxe are husband and wife who resided in Menlo Park, Calif., at the time their petition was filed in this case. They filed their income tax returns for the taxable years 1961, 1962, 1963, and 1964, using the cash receipts and disbursements method of accounting, with the district director of internal revenue, San Francisco, Calif. Robert E. Foxe will hereinafter be referred to as the petitioner.

In 1958, the petitioner had worked for several years for the Constitution Life Insurance Co. (Constitution) or related companies in a variety of capacities. His duties included the solicitation of insurance business and the training of sales agents. In the summer of 1958, the petitioner moved from Salt Lake City, Utah, where he had been vice president and sales manager of an insurance company owned by the same interests which owned Constitution, to San Francisco, Calif. On August 1, 1958, he executed with Constitution an instrument entitled "Employment Contract" in which the petitioner was designated as "employee," and Constitution as "employer." This agreement provided:

1. Employer hereby employs and engages employee to render his exclusive services to employer during the term of this contract or earlier termination thereof as herein provided, as a sales manager [for the territory of Northern California and Oregon] and the following shall be the duties of the employee as such sales manager:

Employee shall devote his full time, efforts and services during usual business hours to the employer in the operation and maintenance of sales agency organizations for the solicitation of new business in the Health and Accident, Hospital and Medical Department. His services shall include the hiring and training of salesmen, district managers and supervisors, the handling of advertising in the area and procuring of leads by telephone solicitation; and all activities and duties of the employee shall be under the direction of the employer. The employer, however, shall be reasonable in such direction. It is understood that the employee will work conscientiously to the full limit of his ability and will not devote any time or service during any usual business hour to any other person, firm or corporation without the consent of the employer.

* * * All agents', district managers' and supervisors' contracts shall be on forms approved and supplied by employer.

Employee shall be entitled to receive overriding commissions as provided for herein on the business written during the term of this contract by agents under his direction in the entire territory. * * *

2. The term of employment hereunder shall commence on the date hereof and shall continue for a period of five years thereafter unless sooner terminated as herein provided.

The agreement provided that the petitioner should receive a salary of $750 per month plus—

* * * an overriding commission of 2½% of the total premiums received by employer on Accident and Health, Medical and Hospital insurance, exclusive of initial premiums submitted with applications, on business produced by employee during the term of this contract. No such overriding commissions shall be payable to the employee on policies written by any agents after the expiration of the term or earlier termination of this contract.

The contract further provided:

7. The employee shall keep and maintain records and make an adequate and accurate account to the employer of all moneys collected and disbursed during the preceding month and all records of whatsoever nature, supplies and other material shall be the property of the employer and shall be delivered to the employer upon demand in the event this agreement is terminated or upon the expiration of the term.

\*          \*          \*          \*          \*          \*          \*

10. All leads acquired by employee shall be the property of the employer, and employee shall not turn over any of such leads or give such information to any person, firm or agent other than an agent of the employer. Employee shall not at any time, even after the expiration of the term or earlier termination of the contract intentionally or willfully solicit directly or indirectly policyholders of the employer.

Constitution was given the right to terminate this employment agreement during its term only for material breach or fraud by the petitioner.

Pursuant to this agreement, and while it was in force, between August 1, 1958, and January 3, 1961, the petitioner sold or supervised the selling of health, medical, and accident insurance policies for Constitution in his territory. While the agreement was in effect, Constitution paid the rental and telephone expenses for offices established by the petitioner in his territory. Personnel hired by the petitioner were paid by checks drawn on Constitution.

In selling the types of medical, health, and accident insurance policies sold by the petitioner and his subordinates under the employment contract, customer leads and personal contact between salesmen and customer were important. Premiums due under such policies were due each month or some other short period of time, and the insurance was in effect only for such period as the premiums were paid; either the insurance company or the policyholder could cancel the policy at any time without penalty. Policyholders had little or no contact with the issuing company, and it was necessary for salesmen to contact policyholders from time to time to encourage them to maintain or renew

their policies with Constitution. In the event a customer required a variation in a policy not offered by Constitution, the petitioner would, with Constitution's consent, obtain insurance for the customer with a company which did write the type of policy required, and in that way the petitioner maintained customer contact and confidence. The petitioner performed his duties under the employment contract successfully; at the time the agreement was terminated in January 1961, the petitioner and his subordinates were servicing 20,000 customers, and his renewal commissions amounted to $3,300 per month.

On January 3, 1961, the petitioner and Constitution executed a "General Agents Contract," under which the petitioner was to act as an independent contractor for Constitution in northern California. On the same day, the two parties executed an "Agreement," which recited the execution of the general agents agreement, the petitioner's desire for funds and facilities to establish his agency, the existence of the August 1, 1958, employment contract which the general agents contract superseded, and Constitution's desire to be relieved of liabilities under the earlier contract. The new agreement provided the terms for terminating the employment contract. Under this agreement, the petitioner was to receive the 2½-percent overriding commission as provided for under the terms of the employment contract, but only to the extent of business written by him or his subordinates between August 1, 1958, and December 31, 1960. The right to such commissions was vested for 10 years, except that if the petitioner died within such 10 years, his widow or child under 25 would continue to receive renewal commissions for at least 5 years. The agreement further provided that Constitution would pay to the petitioner $18,000 over a period of 10 months, as an "expense allowance" in connection with the establishment of a general agency.

The petitioner became a general agent for Constitution after January 3, 1961. He took with him into his general agency three of the people whom he had supervised as sales manager under the 1958 employment agreement; the others stayed with Constitution.[1] If the others had left Constitution, for example to join the petitioner's general agency, they would have given up rights under their employment contracts to renewal commissions on policies which they had written.

Pursuant to the termination agreement, the petitioner received $16,200 as his "expense allowance"[2] in 1961, and overriding or renewal commissions as follows: 1961—$26,598.09, 1962—$19,263.17, 1963—$13,157.22, 1964—$9,912.28. On his tax returns, the petitioner did not

---

[1] The record does not disclose how many people the petitioner had working under him prior to the termination of his employment contract.

[2] The petitioner neither received nor reported on his income tax return the balance of the $18,000 due him as an expense allowance under the termination agreement. The respondent concedes that this balance, $1,800, is not taxable to the petitioner.

report as income the $16,200 expense allowance received in 1961, but reported as ordinary income the $26,598.09 in commissions received in that year; he reported the commissions received under the termination agreement in 1962, 1963, and 1964 as gains from the sale or exchange of a capital asset.

### OPINION

The petitioner's position is that he should be allowed to treat amounts received under the January 3, 1961, termination agreement in the form of expense allowance and renewal commissions as gain from the sale or exchange of a capital asset.[3] This position rests on the proposition that under the 1958 employment agreement the petitioner had, in January 1961, a property right or rights which constituted a capital asset, and that the termination agreement constituted a sale of such capital asset to Constitution. The respondent's position is that the 1961 termination agreement did nothing more than terminate an employment agreement, under which the petitioner had no right constituting a capital asset, but only the right to continue to sell policies to, and renew policies with, customers, receiving renewal commissions thereon. Payments received for the relinquishment of such rights, says the respondent, are, under the principle of *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962), rehearing denied 312 F. 2d 744 (C.A. 5, 1963), and *Joseph W. Brown*, 40 T.C. 861 (1963), ordinary income. We agree with the respondent.

The petitioners rely on *Nelson Weaver Realty Co.*, 307 F. 2d 897 (C.A. 5, 1962), and *Jones* v. *Corbyn*, 186 F. 2d 450 (C.A. 10, 1950), and contend that the petitioner established under his 1958 employment contract an insurance "agency," which, under the 1961 termination agreement, he "sold" to Constitution. However, both those cases have since been limited by the circuits in which they were decided. See *Bisbee-Baldwin Corporation* v. *Tomlinson*, 320 F. 2d 929 (C.A. 5, 1963); *Wiseman* v. *Halliburton Oil Well Cementing Co.*, 301 F. 2d 654 (C.A. 10, 1962); *Joseph W. Brown*, *supra* at 867–868. Moreover, the record simply does not support the petitioner's view of the facts. Under the 1958 agreement, the petitioner was clearly an employee, and nothing more. It may well be that he was an effective and successful employee, acting with a great deal of independence in establishing an organization which benefited Constitution and, because of his rights to commissions, himself; but such facts do not transform his rights to ordinary income into capital assets.

---

[3] On brief, for the first time, the petitioner contends that renewal commissions received in 1961 under the termination agreement, which he reported on his return as ordinary income, were properly reportable as capital gain. This issue was not raised by the pleadings or in any other adequate manner and is, therefore, not properly before us. If it were, we would reach the same result with respect to it as we do with respect to the other payments received by the petitioner under the termination agreement.

Also at trial, the petitioner abandoned his position that the $16,200 "expense allowance" received by him in 1961 was excludable; he now concedes that such amount is taxable, but maintains that it is capital gain rather than ordinary income.

The petitioner claims that in his work under the employment agreement, he built up "something of value, an organization, a going concern, an agency, call it what you will," and contends that Constitution acquired this "something of value" by reason of its payments under the 1961 termination agreement. He points out that in the medical, health, and accident insurance field, personal contacts between a salesman and customers are important to an insurance company, and a company which can acquire an established sales force, instead of having to build one up from scratch, acquires something of real value. This, he says, is what Constitution acquired—the "going concern value" of an organization which the petitioner developed and established. However, even if the petitioner did build up an organization of value, it was not his to sell, since Constitution under the contract owned all the property comprising such organization. As to the customer contacts or "leads," for example, which the petitioner acquired in the course of his employment, and which were, no doubt, part of the "going concern value" of the organization he developed in his employment, the 1958 agreement specifically provided that they were the property of Constitution, not of the petitioner. They were not his to sell. Thus, the present case is wholly different from *Edward A. Kenney*, 37 T.C. 1161 (1962), and *George J. Aitken*, 35 T.C. 227 (1960), on which the petitioner relies, and in which we allowed taxpayers capital gains treatment on the sale of insurance "expirations" or leads owned by them.

As to the sales force, it is not clear from the record whether personnel hired and trained by the petitioner were employees of Constitution, or independent contractors. They do not appear to have been employees of the petitioner, and, in any event, their relationship to him was not such as to constitute a sales force which he could sell or transfer. He argues that some people hired and trained by him over the years preceding and during the period the employment agreement was in effect had loyalty to him personally, and it appears from the record that the disposition of the sales force was part of the negotiations leading to the termination agreement and the general agents contract. However, the salesmen who stayed with Constitution when the petitioner left had a strong incentive to do so, retention of their rights to renewal commissions; and there is no indication that the petitioner had or exercised any control over them which could be considered the sale or exchange of a capital asset.

In short, the petitioner had, under the employment agreement, no business of his own, the "goodwill" or "going concern value" of which was, or could be, sold to Constitution. The only right of value which the petitioner had under the employment agreement was the right to perform services and receive ordinary income therefor. Whether this

case is viewed as involving the transfer of property which is not a capital asset or as involving an anticipatory assignment of income, the result is the same (see *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35, 43–44 (C.A. 4, 1965), affirming on this point 42 T.C. 510 (1964)); amounts received for the termination or sale of such rights constitute ordinary income. *United States* v. *Eidson, supra; Joseph W. Brown, supra; Thurlow E. McFall*, 34 B.T.A. 108 (1936); cf. *Hallcraft Homes, Inc.* v. *Commissioner*, 336 F. 2d 701 (C.A. 9, 1964), affirming 40 T.C. 199 (1963).

The petitioner on brief states, in effect, that as of January 3, 1961, there were no earned renewal commissions due and owing to him. Thus, he argues, any renewal commissions which he received under the termination agreement resulted from the efforts of persons other than himself or those under his control in producing continuations or renewals of policies written by the petitioner or his subordinates during the period the employment agreement was in effect. Therefore, he concludes, such renewal commissions cannot be considered as income from his personal services. This argument misses the point. Where the payor, Constitution, obtained the funds to satisfy its obligation to the petitioner—the obligation which arose out of the petitioner's rights to earn future income—is immaterial; the point is that the petitioner received them in substitution for, or in anticipation of, future ordinary income. *United States* v. *Eidson, supra; Joseph W. Brown, supra; Thurlow E. McFall, supra.* Nor does the fact that the payments to the petitioner under the termination agreement were contingent on future events, rather than fixed as in a lump-sum payment, affect the result.

The respondent contends that the termination agreement gave the petitioner nothing in regard to renewal commissions that he did not have under the employment agreement; as he reads the employment agreement, the petitioner was entitled to all future renewal commissions on any policy written during the term of employment. Under this view, the renewal commissions received by the petitioner might be considered as already earned as of January 3, 1961, and therefore taxable as ordinary income under the rationale of such cases as *Hubert M. Luna*, 42 T.C. 1067 (1964), and *Floyd L. Turner*, 38 T.C. 304 (1962). The petitioner disagrees with this view of the employment agreement, arguing that the petitioner had thereunder no vested right to renewal commissions. We need not consider the question thus raised, because in either event the result is the same. Whether the petitioner received the renewal commissions as earned income, or in substitution for the right to earn income, the authorities on which we rely make it clear that such commissions were ordinary income.

The petitioner poses the question in his brief, why, if Constitution already owned the valuable organization which he developed, was it

willing to pay him what it did—the renewal commissions and "expense allowance"—to terminate his employment contract? The record is silent on this point; however, the petitioner did relinquish his right to receive commissions on policies written by him and his subordinates during the remainder of the employment contract, and Constitution may have been influenced by a desire to induce the petitioner to establish a general agency. These may or may not be the reasons; the point is that there are explanations for the 1961 transactions other than one positing a sale or exchange of a capital asset, which explanation, as we have shown, has no basis in the record.

In conclusion, we hold that both the renewal commissions and the "expense allowance" received under the termination agreement are taxable as ordinary income.

*Decision will be entered for the respondent.*