DEVEAUX AND MARJORIE CLARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clark v. Commissioner
Docket No. 27983-91
United States Tax Court
T.C. Memo 1994-278; 1994 Tax Ct. Memo LEXIS 274; 67 T.C.M. (CCH) 3105; June 16, 1994, Filed *274 Decision will be entered for respondent. For petitioner: Belan K. Wagner, Carl P. Blaine, and Jeffrey W. Curcio. For respondent: Kathryn K. Vetter. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1986 in the amount of $ 129,443 and an addition to tax under section 6661 in the amount of $ 32,361. The issues for decision are: (1) Whether the amount of $ 497,164 received in 1986 by petitioner Deveaux Clark upon the termination of his agency management contract with Farmers Insurance Group is taxable as ordinary income or as a long-term capital gain. We hold that it is taxable as ordinary income. (2) Whether petitioners are liable for an addition to tax pursuant to section 6661. [1] We hold that they are.
FINDINGS OF FACT Some *275 of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition herein was filed, petitioners Deveaux and Marjorie Clark resided in Rancho Murieta, California. Petitioners are married and filed a joint Federal income tax return for the year at issue, reporting their income on the basis of cash receipts and disbursements. (References to petitioner in the singular are to Deveaux Clark). Petitioner has been in the insurance business for a number of years and has had an insurance agency relationship with what is now known as Farmers Insurance Group (Farmers). Petitioner held the position of a Farmers division agency manager in Montana prior to his appointment as a Farmers district manager in Utah. A Farmers division agency manager (as opposed to a district manager) is a liaison position between the field force and the company, with primary focus on supervision of district managers, introduction of new programs to the agency force through the district manager, and compliance with company procedures and policies. Farmers division agency managers did not have employees, a specific *276 place of business, or any significant business equipment. A Farmers division agency manager normally rode circuit between the various districts and consulted with and supervised the district manager. In 1965, petitioner entered into an Agreement of Sale as buyer with John H. Chamberlain (Chamberlain) for the acquisition of Chamberlain's insurance business as insurance agent and as a district manager for Farmers Insurance Group. The agreement provided in relevant part: 1. The SELLER hereby sells to the BUYER all of his right, title and interest in: a. His insurance business as an insurance agent and as a District Manager for the Farmers Insurance Group organizations, * * *, including the goodwill of the business as well as the possibility of obtaining other business from the present policyholders of the business being sold, the office location, telephone number, and records of said business, and his interest in all renewal service fees allocated to the described territory by the Companies; * * * 2. The BUYER will pay to the SELLER the sum of $ 52,988.10 less certain agreed offsets for a net amount of $ 46,680.70.
The purchase contract between petitioner and Chamberlain *277 was required and provided to the parties by Farmers. Concurrent with petitioner's acquisition of Chamberlain's insurance business, petitioner entered into a District Manager's Appointment Agreement ("DMAA") with Farmers Insurance Companies. Under the terms of the DMAA, petitioner was appointed as district manager in district No. 76-03 in the State of Utah, effective November 1, 1965. Under the DMAA, Farmers agreed, inter alia: 1. To pay to the District Manager for all business produced by or through him and written by the Companies, production and service commissions and underwriting, claims, production, or other bonuses, in accordance with scales and rules adopted from time to time, by the respective Companies, provided, that in the event there is or shall in the future be more than one classification or schedule of commissions applicable to District Managers, the Companies shall have the sole discretion as to which classification or schedule shall be applicable to the District Manager, and shall have the right, in their sole discretion, to make such schedule or commission changes as may at any time be deemed advisable; [Emphasis added.]
Under the DMAA, petitioner *278 agreed, inter alia: 1. To recommend for appointment and train as many agents acceptable to the Companies as may be required to produce sales commensurate with the potential of the territory; 2. To collect premiums and fees from the agents and remit them to the Companies; 3. To actively represent the Companies and * * * to represent no other insurer without Farmers' consent; 4. To conform to all regulations, operating principles and standards of the Companies, and to diligently handle and settle claims; 5. To maintain adequate records and to surrender on cancellation or termination of the agency or the agreement, all records, levy lists, cards, books, manuals, papers, forms, or other material of whatsoever kind whether or not furnished by any of the Companies, having to do in any manner with the business of the Companies; 6. To maintain telephone service under the name Farmers Insurance Group. Upon cancellation or termination, to assign without charge to the Companies' nominee, all right, title and interest in said telephone number; 7. That the Companies had the exclusive right, in their sole discretion and at any time, to change commission rates, schedules *279 or classifications.
The agreement could be canceled or terminated without cause by either party on 30 days' written notice. The DMAA provided that in the event of cancellation or termination of the agencies, Farmers agreed to give first consideration to a written nomination of his successor by the district manager. The DMAA provided, inter alia: The District Manager or his heirs or personal representative may negotiate with such nominee for compensation for the nomination and such goodwill as may attach to the agencies.
The DMAA also provided: The DISTRICT MANAGER further agrees that the amount of compensation for the nomination and goodwill of the agency, or portion thereof being sold, and all of his interest therein will be reasonable but will in no event exceed an amount equal to five times the DISTRICT MANAGER service commissions paid to him during the six month period immediately preceding the date of cancellation or termination (or sale under paragraph D) on policies in force in the district (or the portion sold in case of sale under paragraph D) on said date.
On November 1, 1967, petitioner entered into a new DMAA for the same district covered in the *280 1965 contract. The 1967 DMAA was required by Farmers in connection with its Agency Development Plan. Prior to the Plan, district managers were required to house agents in their district within their own office. The Plan concept was to reduce the overwrite commissions of the district managers and shift some of the district manager's overhead expense to agents by requiring the agents to set up their own offices. This new agreement superseded all prior agreements. The 1967 Agreement contained an exhibit entitled "Computation of Conversion Factor for District 76-03". The exhibit in part states: To protect your existing contract value, a conversion factor has been computed which, when multiplied by the converted service commissions for the last six months, produces a contract value equal to your present appointment agreement.
The 1967 agreement incorporated the previous sections of the 1965 DMAA, and in addition, the 1967 agreement provided in paragraph E, in pertinent part: In the event of cancellation or termination of the agencies created * * *, (1) the Companies may, at their option, elect to pay 'contract value', * * *, to the District Manager, * * *, or (2) the Companies *281 may agree to give written consideration to a written nomination of his successor by the District Manager, * * *, provided such nominee is in all respects acceptable to the Companies.
The 1967 Agreement also specified that Farmers owned certain records that pertained to its own policyholders; paragraph F of the contract states in pertinent part: The District Manager understands and agrees that all lists and records of any kind pertaining to policyholders, or expirations * * * are the secret and confidential property of the Companies * * *. If the Companies do not elect to pay 'contract value', the District Manager may negotiate with such nominee for compensation in an amount not exceeding "contract value" for the nomination and his interest under the Appointment Agreement. * * * * * * The Companies shall be entitled to exercise an exclusive and unlimited discretion in the acceptance or rejection of any and all nominees. * * * The 'contract value' of the district will be based on the District Manager's service commissionspaid to him during the six months period immediately preceding the date of cancellation or termination. The District Manager agrees that the amount *282 of compensation for the nomination and all of his interest in his Appointment Agreement will be reasonable but will, in no event, exceed the 'contract value'.
In addition, paragraph G states in pertinent part; All renewals and expirations, as well as any and all rights or privileges for the continuing effectiveness of policies produced on behalf of any of the Companies, including all records pertaining thereto, are and shall at all times remain the property of the Companies, * * *.
While petitioner was district manager, he advertised in the yellow pages under the heading of Farmers Insurance Group and listed the Farmers offices underneath. Petitioner also advertised in the newspaper and with doorknob hangers using the Farmers name and logo. There was a sign on the front of petitioner's office building which read "Farmers Insurance" and "District Sales Office". Farmers had to approve all advertising. The advertisements did not mention petitioner Deveaux Clark. During his tenure as district manager, petitioner received training materials from Farmers such as videos, films, and manuals for the agents. Farmers also conducted schools for the full-time agents. Petitioner *283 also developed some of his own training materials. These included videos, cassettes, films, photographs of sections of the rate manual, and photographs of sections of the applications. Petitioner also accumulated "expirations" for non-Farmers policies. For Farmers policies, the only expirations were the levy lists and folios. Petitioner also developed the agents for the district. He trained the agents in how to solicit expirations over the telephone and to collect lists of names. The agents signed contracts with Farmers Insurance Group. Petitioner was not a party to those contracts. Petitioner notified Farmers by letters dated November 26, 1985, and November 26, 1986, that he would be leaving Farmers effective December 31, 1986. Farmers sent petitioner a Notice of Termination dated December 31, 1986, and Farmers paid to petitioner the contract value amount. Farmers issued to petitioner Form 1099 for 1986 in the amount of $ 748,410.01. Petitioner reported $ 251,246 of that amount on his Schedule C for his insurance business, and reported the balance of $ 497,164 (net of a claimed $ 60,000 basis) as a long-term capital gain on Schedule D. On or about December 22, 1986, petitioner *284 sold the office building used for the insurance business to his sons, Day Dunyon Clark and Jay Cody Clark. Petitioner sold all of the equipment used for the insurance business concurrently with the sale of the office building. Some of the equipment was sold to Day Dunyon Clark and Jay Cody Clark, and some was sold to petitioner's successor to the district manager position in a separate transaction. The sales of these items were reported on petitioners' tax return as separate transactions from the sale of the business. On September 19, 1991, respondent issued a statutory notice of deficiency to petitioners. In the notice, respondent determined deficiencies in and additions to petitioners' 1986 Federal income tax, recharacterizing the $ 497,164 petitioner claimed as a capital gain as ordinary income from the cancellation of the contract, less a deduction for the $ 60,000 basis claimed by petitioner. OPINION Petitioner's position is that he should be allowed to treat the $ 497,164 (less a basis of $ 60,000) that he received in 1986 under the cancellation agreement as a long-term capital gain from the sale or exchange of a capital asset. He argues that the facts of the case show *285 that he sold a capital asset; that the transaction was a sale or exchange; and that the formula used to determine the contract value of the intangible asset, since it was based on a multiple of petitioner's historical earnings, was not the sale of a right to perform future services. To the contrary, respondent's position is that the $ 497,164 received by petitioner in 1986 (less a deduction for the basis of $ 60,000 [2]) should be treated as ordinary income. Respondent asserts that the only thing relinquished by petitioner was his right under the cancelled contract to perform future services and that such contract right was neither a "capital asset" as defined under section 1221, nor was it "sold or exchanged" within the meaning of sections 1222 and 1231. We agree with respondent. *286 Issue 1. Capital Gain or Ordinary Income
Capital gain (or loss) arises from the sale or exchange of a capital asset. "While a capital asset is defined * * * as 'property held by the taxpayer,' it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134 (1960). A nonstatutory exception to capital treatment was alluded to in Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 217 n.5 (1988), and involved claims of right, "in which gain upon the sale of what otherwise is property to which no statutory exception under section 1221 applies is properly treated to the extent required as ordinary income rather than capital." FNMA v. Commissioner, 100 T.C. 541, 573 n.30 (1993). And, as the Court stated in Woolsey v. Commissioner, 326 F.2d 287, 291 (5th Cir. 1963), Fundamental to a proper decision in each case, and to the application of well recognized rules, is a determination of the type *287 and nature of the underlying right or property assigned or transferred. It is always pertinent to inquire how the proceeds to be received would have been taxable if there had been no assignment of the contract. Close scrutiny is required if the consideration received is actually a present substitute for what would have been ordinary earned income in the hands of the assigning taxpayer, if the assignment or transfer had not been made. A mere 'sale or exchange' does not convert a right to earn income in the future which would be taxable as ordinary income to the taxpayer, into a capital gain.
The result in this case is governed by Elliott v. United States, 431 F.2d 1149 (10th Cir. 1970); Furrer v. Commissioner, 566 F.2d 1115 (9th Cir. 1977), affg. per curiam T.C. Memo. 1976-331; Foxe v. Commissioner, 53 T.C. 21 (1969); and Deal v. Commissioner, T.C. Memo. 1973-49. In each of these cases, the receipt of money as compensation for the termination of the right to receive future income was held to constitute the receipt of ordinary *288 income. In Deal v. Commissioner, supra, this Court concluded that the amount the taxpayer received upon termination of his "appointment agreement" should be taxed as ordinary income. As in the instant case, the taxpayer in Deal had an "appointment agreement" with the Farmers Insurance Group, under which the taxpayer received as compensation a commission based on premiums received on new and existing policies. Upon termination of his contract, the taxpayer was paid an amount based on renewal commissions which would have become payable to the taxpayer. In holding that the termination proceeds were ordinary income, the Court found "the petitioner relinquished nothing more than his right under the contract to perform future services, and thus the proceeds flowing from the relinquishment of that right are not entitled to capital gain treatment." Deal v. Commissioner, supra.
Foxe and Elliott also involve a termination of an "employment agreement" with an insurance company. In Foxe, in finding the termination proceeds were taxable as ordinary income, the Tax Court found that "petitioner had, under *289 the employment agreement, no business of his own, the 'goodwill' or 'going concern value' of which was, or could be, sold * * *. The only right of value which the petitioner had under the employment agreement was the right to perform services and receive ordinary income therefor." Foxe v. Commissioner, supra at 26. Similarly, in Elliott v. United States, supra at 1156, the Court of Appeals, in affirming the District Court, found that whatever goodwill Elliott had built up for the company as its agent belonged to the company and that whatever goodwill he had built up for himself as a general agent, he retained. The only thing relinquished by Elliott was his right to render services and earn commissions for such services in the future, which right was "cancelled and terminated." Id. Consequently, it was held that the termination proceeds received by Elliott were taxable as ordinary income. In Furrer v. Commissioner, supra, the taxpayer, an insurance agent, was awarded damages for breach of contract when the insurance company for which he was an agent terminated his contract. *290 As an insurance agent, he was paid entirely on a commission basis, computed as a percentage of gross premiums paid on policies. The taxpayer argued that the damages the court awarded were compensation for the loss of contract rights, and that the contract rights constituted capital assets. In affirming the Tax Court's holding that the damages constituted ordinary income, the Court of Appeals stated: "If all contracts granting rights could be considered capital assets, without inquiry into the nature of the rights granted, almost all ordinary income from salaries, wages or commissions could be transformed into capital gain. Furrer's right was the right to earn commission income." Furrer v. Commissioner, supra at 1117. Here, as in Furrer, the nature of petitioner's right under the contract with Farmers was the right to earn commission income from the sale of insurance policies within the district. "The fact that others are excluded from the sources available to * * * [petitioner] for earning income in no way changes the fact that his income derived from personal services and that what he lost through termination was the right to earn future *291 income." Id. And as the court noted in Holt v. Commissioner, 303 F.2d 687, 691 (9th Cir. 1962), affg. 35 T.C. 588 (1961): "The nature of the right to receive future income as ordinary income does not change into capital gain by the mere receipt of a lump sum in lieu of such future payments." Petitioner in the instant case asserts that the facts establish that he owned valuable contract rights, that those contract rights constitute capital assets, and that he sold those rights to Farmers. Petitioner cites Michot v. Commissioner, T.C. Memo. 1982-128, for the proposition that the Court must undertake an analysis of the nature of the rights given up in order to determine whether to accord capital gain or ordinary income treatment to the proceeds received upon the termination of the contract. In Michot, the taxpayer acquired the right to develop Burger Chef franchises in Louisiana. The agreement called for him to pay a sum of money for this right, and he promised to franchise a certain number of stores within a set period of time. For his efforts, the taxpayer was entitled to receive *292 a set commission whenever a store opened and, in addition, 50 percent of the royalties Burger Chef received from the operation of the stores. Burger Chef terminated the franchise agreement, and the taxpayer received a cash payment as a settlement, which he reported as a capital gain. The Court noted with respect to a gain on the sale of property: "The true inquiry is whether the gain is attributable to an appreciation in value over time, usually caused by market forces. If so, capital gain treatment is proper." Id. The Court thereupon stated that in determining to what a taxpayer's gain is attributable, "the crucial matter is what he gave up, not what he received." Id.; Commercial Solvents Corp. v. United States, 192 Ct. Cl. 339, 427 F.2d 749 (1970); Kingsbury v. Commissioner, 65 T.C. 1068 (1976). The Court found that the taxpayer had, indeed, surrendered rights which could be accorded capital gain treatment; however, one of the rights surrendered was the right to earn future commissions. As to this right, the Court held that the taxpayer's surrender of the right to receive future commissions *293 should be taxed as ordinary income. As the Court noted with respect to the commissions, "their value arises from petitioner's services and is only slightly dependent upon market forces." Michot v. Commissioner, supra.
In the case at hand, petitioner's agreement with Farmers entitled petitioner to a commission when a new policy was sold or an existing policy renewed. The amount of the commission was set; it did not vary. In surrendering that right, petitioner gave up an income stream. Since the income stream was dependent upon his personal services, that right gives rise to ordinary income. As we view this question before us, what petitioner relinquished in return for the $ 497,164 was the right to render personal services as district manager of district No. 76-03 and to earn an override commission on all policies sold and renewed in the district. His right under the contract to future commissions thereby came to an end. Such commissions, had they been earned, would have constituted ordinary income. Petitioner places some importance in the fact that the payment for the "contract value" was calculated using historical earnings rather than on *294 future anticipated earnings as was the case in Deal v. Commissioner, T.C. Memo. 1973-49. "It is a basic tenet of Federal tax law that tax consequences should turn on the substance of a transaction rather than on its form." Estate of Taracido v. Commissioner, 72 T.C. 1014, 1025 (1979) (citing Gregory v. Helvering, 293 U.S. 465 (1935)). As the Supreme Court held in Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 266 (1958): The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.
The reality of the situation here is that petitioner obtained an employment contract with Farmers for the primary purpose of managing district No. 76-03. It is clear from the record that Farmers viewed the contract as an employment contract. As a Farmers district manager, petitioner's duties consisted *295 of maintaining records pertaining to Farmers' business within district No. 76-03 and recruiting, training, and assisting the agents under his supervision. Petitioner was rendering personal services to Farmers for compensation. As compensation for these personal services, petitioner received an overwrite commission on premiums collected on new and existing policies. If the contract is viewed as an employment contract, with the payment of commissions as the source of such personal service compensation, then the settlement amount must be treated as ordinary income. Estate of Taracido v. Commissioner, 72 T.C. 1014 (1979). Petitioner testified that over the years as district manager for Farmers, he built up goodwill and tangible assets such as exlists, and it is these assets that Farmers purchased. The record does not support petitioner's assertion that Farmers intended to compensate petitioner for the transfer of any property. As evidenced by the formula used to calculate "contract value", it is obvious the real value was in the right to receive future commissions. There is nothing in the record to indicate that there was bargaining for goodwill *296 nor for the purchase of the "ex-lists." Under the 1967 Agreement, all renewals and expirations, as well as any and all rights or privileges for the continuing effectiveness of policies produced on behalf of any of the Companies, including all records pertaining thereto, were and should at all times remain the property of Farmers. The short answer is that petitioner transferred nothing to Farmers. The contract with Farmers was not sold or exchanged, but was terminated. On December 31, 1986, petitioner's services as a Farmers district manager came to an end. The local agents that petitioner had obtained for Farmers remained, as before, local agents of Farmers. As the Court noted in Foxe v. Commissioner, 53 T.C. at 26: even if the petitioner did build up an organization of value, it was not his to sell, since Constitution under the contract owned all the property comprising such organization. As to the customer contacts or 'leads,' for example, which the petitioner acquired in the course of his employment, * * *, the 1958 agreement specifically provided that they were the property of Constitution, not of the petitioner. They were not his to sell.
*297 Therefore, to paraphrase the Court in Vaaler v. United States, 454 F.2d 1120, 1123 (8th Cir. 1972): Whatever goodwill * * * [petitioner] built up for the insurance company, while acting as its * * * [district manager], resulted from his [personal] services as such * * * [district manager] and belongs to the insurance company. Whatever goodwill or business reputation he built up for himself * * * [as District Manager] while he served the insurance company under the * * * contract, he retained.
For the foregoing reasons, we find that the lump-sum payment received by petitioner upon the termination of the district manager contract constitutes a payment for the termination of the right to receive future income in the form of commissions. Accordingly, we find the payment constitutes ordinary income. Issue 2. Section 6661 Substantial Understatement
Respondent determined by notice of deficiency that petitioners are liable for the addition to tax for a substantial understatement under section 6661. A "substantial understatement" occurs when an "understatement exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to *298 be shown on a return." Sec. 6661(b)(1)(A). An "understatement" means the excess of the amount of the tax required to be shown on a return over the amount of tax imposed which is shown on the return. Sec. 6661(b)(2)(A). The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 501-503 (1988). In general, if a taxpayer has substantial authority for the tax treatment of the item in question, or has adequately disclosed the tax treatment of the item on the return, the taxpayer may escape liability for the addition to tax with respect to that item. Sec. 6661(b)(2)(B)(i) and (ii). In the instant case, we have determined petitioners have understated their income tax liability for the year at issue. The understatement amounts to a substantial understatement as defined under section 6661(b)(1)(A). Petitioners contend that the penalties should not be assessed since petitioners acted in good *299 faith and reasonably relied upon professional advice in reporting the income at issue here as capital gains. The Secretary may waive all or part of the section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). The denial of a waiver by the Secretary is reviewable by this Court only for abuse of discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). The question before the Court is not whether the Court would have decided differently; rather, the question is whether denial of the waiver was an abuse of discretion. Id. at 1084. In determining whether petitioners had reasonable cause and acted in good faith, we look primarily to the extent of their efforts to assess their proper tax liability under law. Sec. 1.6661-6(b), Income Tax Regs. "The most important factor in determining reasonable cause and good faith is 'the extent of the taxpayer's effort to assess * * * [his] proper tax liability under the law.'" Daoust v. Commissioner, T.C. Memo. 1994-203 (quoting sec. *300 1.6661-6(b), Income Tax Regs.). Petitioner has introduced no evidence of his efforts to assess his proper tax liability, other than his statements at trial that he engaged the services of a C.P.A. to aid him in the planning for his retirement from Farmers and in the preparation of his Federal income tax return for 1986, and that he relied on the characterization by the C.P.A. that the income in question should be reported as a capital gain. The record, other than the testimony of petitioner, contains no reliable evidence regarding the nature of the advice received from petitioners's C.P.A. Indeed, there is a complete lack of testimony from the C.P.A. We, therefore, are left with petitioner's uncorroborated self-serving testimony, which this Court need not accept. Sacks v. Commissioner, T.C. Memo. 1994-217; see also Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159. "The burden of proof * * * [is] upon petitioners and we cannot assume that the testimony of a critical absentee witness would have been favorable to them. Indeed, the normal inference *301 is that it would have been unfavorable." Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Even more fundamental, "if no reliable evidence reveals the nature of the professional tax advice received, purported reliance on such advice is of no assistance to the taxpayer". Dixon v. Commissioner, T.C. Memo. 1991-614; Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. Even if we were to find that petitioners received and relied upon professional advice, they would also have to show that the advice was based upon all of the facts. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), *302 affg. per curiam T.C. Memo. 1968-98. Petitioner testified that he disclosed all information to his C.P.A. concerning the nature of his contract with Farmers, but without the testimony of the C.P.A. or reliable evidence to show what was actually communicated, we cannot conclude that petitioner acted reasonably and in good faith in relying on the advice of his C.P.A. that the money received upon the termination of his management contract constitutes a capital gain. On this record, the Court finds respondent did not abuse her discretion in her decision. Accordingly, respondent's determination in the notice of deficiency is sustained. To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. On their original return, petitioners claimed a basis of $ 60,000 as a deduction in arriving at gain from the sale of a capital asset. The purchase agreement between petitioner Deveaux Clark and John H. Chamberlain provided that petitioner would pay to Chamberlain the sum of $ 52,988.10, less certain agreed offsets for a net amount of $ 46,680.70. In respondent's notice of deficiency, $ 60,000 was allowed as an ordinary loss; therefore, the amount and payment of the purchase price is not at issue here.↩