T.C. Memo. 2002-305


UNITED STATES TAX COURT


EDGAR L. AND JOAN H. PARKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5732-01.                    Filed December 16, 2002.

        P, self-employed, worked under contract as a
district manager for F, a group of insurance companies.
F canceled P's contract and paid P an amount designated
"Contract Value", based on the quantity (length of
service) and quality (final 6 months' earnings) of the
services rendered by P to F.  P failed to pay self-
employment tax with respect to the Contract Value,
claiming that it constituted a capital gain.
        <u>Held</u>:  The contract value is subject to the tax on
self-employment income and is not capital gain.

<u>Robert B. Alexander</u>, for petitioners.

<u>Donna M. Palmer</u>, for respondent.

MEMORANDUM OPINION

HALPERN, <u>Judge</u>:  By notice of deficiency dated February 22, 2001 (the notice), respondent determined deficiencies in petitioners' Federal income taxes of $58,127, $22,433, and $11,221 for their taxable (calendar) years 1996, 1997, and 1998, respectively.

The issue for decision is whether certain payments received by petitioner Edgar L. Parker (petitioner) are ordinary income subject to self-employment taxation or are capital gains income, which is not subject to self-employment taxation.  We conclude that the payments are ordinary income subject to self-employment taxation.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

Some facts have been stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.  We need find few facts in addition to those stipulated and shall not, therefore, separately set forth our findings of fact.  We shall make additional findings of fact as we proceed.

## Background

At the time the petition was filed, petitioners resided in Kingwood, Texas.

On September 1, 1985, petitioner, previously an insurance agent, was appointed a district manager by a group of insurance companies, Farmers Insurance Companies (the companies). To accomplish the appointment, petitioner and the companies executed a document entitled "District Manager's Appointment Agreement" (the agreement). As a district manager, petitioner could not personally sell insurance policies but recruited, trained, and supervised agents within his district to do so. As a district manager, petitioner was not treated as an employee by the companies.

Pursuant to the agreement, petitioner received a service commission overwrite on all business produced by the companies' agents within his district. A service commission overwrite is a specified commission paid to a district manager based on each insurance policy sold and on renewals of policies sold by the supervised agents. The agreement states that either the companies or petitioner can cancel it on 30 days' written notice, and any service commission overwrites unpaid as of the date of cancellation are deemed unearned, with petitioner's rights with respect to such commissions being deemed waived.

Petitioner had completed 11 years of service as a district manager when he received written notice that the companies were canceling the agreement. The agreement was canceled as of

September 16, 1996.  In part, the agreement provides the following with respect to cancellation:

E.   In the event of cancellation * * * of the agency created hereby for any reason whatsoever, * * * (1) the Companies may at their option elect to pay "Contract Value", as hereinafter defined, to the District Manager, his/her personal representative or heirs, or (2) the Companies agree to give consideration to a written nomination of his/her successor by the District Manager, or in case of the District Manager's death, by his/her heirs or personal representative, provided such nominee is in all respects acceptable to the Companies.

If the Companies do not elect to pay "Contract Value" it is agreed that the District Manager, or his/her heirs or personal representative, may negotiate with such nominee for compensation in an amount not exceeding "Contract Value" for the nomination and the District Manager's interest under his/her Appointment Agreement.  * * *

\*     \*     \*     \*     \*     \*     \*

CONTRACT VALUE

"Contract Value" will be based upon (1) the service commission overwrite paid to the District Manager during the six months immediately preceding termination, and (2) the number of years of service as District Manager for the Companies in this district all in accordance with the following schedule:

SCHEDULE

\*     \*     \*     \*     \*     \*     \*

7.   10 or more years as a District Manager--5 times the last 6 months' service commission overwrite.

\*     \*     \*     \*     \*     \*     \*

Payment of "Contract Value" by either the Companies or the nominee will be based on the following schedule:

*    *    *    *    *    *    *

E (7) Above – Four equal semi-annual installments.

*    *    *    *    *    *    *

> The District Manager agrees to transfer and assign all of his/her interest under the District Manager Appointment Agreement and his/her agency to the nominee acceptable to the Companies, or to the Companies themselves in the event they elect to pay the "Contract Value" as hereinabove provided, and further agrees that for a period of three years from date of said cancellation * * * he/she will neither directly nor indirectly in any manner solicit, accept or service, for or on behalf of himself/herself or any insurer or broker, the insurance business of any policyholder of any of the Companies within the County or Counties in which the district is located and all Counties immediately adjoining.

The agreement also obligates petitioner to surrender to the companies on cancellation of the agreement all records and other materials having to do in any manner with the business of the companies.  It states petitioner's agreement that all lists and records pertaining to policyholders are the property of the companies and that petitioner has no interest, assignable or otherwise, in the "Agency" created by the agreement, except as provided in paragraph E of the agreement (quoted in part above). It further states that, in the event of cancellation, petitioner will not interfere with the agency contracts of the agents or district managers of the companies.

No provision of the agreement provides for any change in "Contract Value", once determined, on account of any subsequent

event, such as policy cancellations or failures to collect premiums.

Following cancellation of the agreement, petitioner received payments from the companies of $439,656, $212,466, and $106,233, in 1996, 1997, and 1998, respectively (collectively, the payments). Petitioners reported the payments as income from an installment sale, from the sale of "Insurance Agency", subject to the favorable long-term capital gains rates.

### Discussion

The principal adjustments giving rise to the deficiencies in question are respondent's reclassifications of the payments, reported by petitioners as installment sale gains (subject to the favorable long-term capital gains rates), as ordinary income subject to self-employment taxation.[1] Other adjustments made by respondent are derivative of those adjustments and are not a matter of dispute between the parties. We have addressed adjustments similar to the principal adjustments on other occasions, e.g., Farnsworth v. Commissioner, T.C. Memo. 2002-29; Schelble v. Commissioner, T.C. Memo. 1996-269, affd. 130 F.3d 1388 (10th Cir. 1997), and the rules are relatively clear. We

---

[1] Notwithstanding that the agreement appears to contemplate that contract value would be paid in four equal semi annual installments, the parties appear to agree that the payments (in their varying amounts) constitute the installment payments of contract value. We shall proceed based on that assumption.

need not engage in an extended discussion to dispose of this case.

Section 1401 imposes a tax on "the self-employment income of every individual". Section 1402(b) defines self-employment income as "the net earnings from self-employment". Section 1402(a) defines self-employment earnings as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions * * * which are attributable to such trade or business". Gain or loss from the sale or exchange of capital assets or from the disposition of other property (except for stock in trade, inventory, or property held primarily for sale to customers in the ordinary course of business) is excluded from the computation of net earnings from self-employment. Sec. 1402(a)(3)(A), (C).

In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), we held that, for income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on." In order to satisfy the nexus standard, the "income must arise from some actual (whether present, past, or future) income-producing activity". Id. at 446.

During the 11-plus years that petitioner was a district manager for the companies, his business consisted principally of recruiting, training, and supervising insurance agents, and he

was compensated exclusively by commissions based on the business produced by those agents. Petitioner's relationship with the companies was governed by the agreement, and once the agreement was canceled, petitioner had no right to any further commissions. He was, however, paid an amount denominated "Contract Value" (contract value), which was based on the commissions paid him during the 6 months immediately preceding the cancellation of the agreement and the number of years of his service as district manager. That amount was not subject to any change once determined. Petitioners do not dispute that, during petitioner's tenure as a district manager, he was a self-employed individual engaged in the business of managing a district for the companies. They do argue that the contract value paid to petitioner following cancellation of the agreement is excluded from the computation of net earnings from self-employment since it is a capital gain or other gain described in section 1402(a)(3)(A) or (C).

In Schelble v. Commissioner, supra, the taxpayer was an insurance agent (not a manager), and, on termination of his agency agreement, he was paid "extended earnings", which amount was determined based on renewal commissions paid to him during the last 6 or 12 months of his service and the number of his years of service. Because the record showed that there was no express agreement for the sale of any assets or any evidence of

vendible business assets, we concluded that the taxpayer had failed to prove that the extended earnings constituted gain from the sale of any capital asset.  We found that, because the extended earnings "were tied to the quantity, quality, and duration" of the taxpayer's prior labor as an insurance agent, there was a nexus between the payments and that business, and the payments constituted net earnings from self-employment, subject to the tax on self-employment income provided for in section 1401.  The Court of Appeals for the Tenth Circuit affirmed, recognizing that the extended payments were in consideration of the taxpayer's return of records and a covenant not to compete, but emphasizing that the extended payments were "tied to the quantity and quality of his prior services performed for [the insurance companies in question]" and were not subject to adjustment on account of any factor unrelated to his prior service.  Schelble v. Commissioner, 130 F.3d 1388, 1393 (10th Cir. 1997).  The Court of Appeals concluded:  "Based on these distinguishing factors, we conclude that Mr. Schelble's payments are sufficiently derived from his prior insurance business to constitute self-employment income subject to self-employment tax under 26 U.S.C. § 1401."  Id.  The Court of Appeals dismissed the taxpayer's argument that he had sold a capital asset for the same reason as the Tax Court; i.e., no evidence of vendible assets nor any language referencing a contract of sale.  Id. at 1394.

Recently, in <u>Farnsworth v. Commissioner</u>, T.C. Memo. 2002-29, we addressed cancellation payments made to a former district manager of Farmers Insurance Group (a group of insurance companies consisting of many of the same insurance companies that constitute the companies).  The district manager's agreement in that case provided for the payment of "contract value" similar to the payment of contract value at issue here, except that, during the taxpayer's tenure as a district manager, "retention amounts" were retained from commissions to reimburse Farmers Insurance Group for payments of "Contract Value" to the district manager's predecessor.  In <u>Farnsworth</u>, as in <u>Schelble</u>, we determined that the payment in question was subject to self-employment tax because it was based on the quantity (length of service) and quality (final 6 months' earnings without reduction for post-termination events) of the services rendered by the taxpayer.  We found that the retention amount device provided an "additional nexus" between the cancellation payments and the taxpayer's prior position as a district manager.  We analyzed the provision of the agreement in question that dealt with business property used by the taxpayer (identical to a provision in the agreement), and found:  "The payments Mr. Farnsworth received were expressly in consideration for the termination of the * * * contract, the payments were not made in return for the transfer of specific property owned by him.  Neither in form nor substance was the

transaction at issue a sale of property by Mr. Farnsworth."
Farnsworth v. Commissioner, supra; see also Baker v.
Commissioner, 118 T.C. 452, 461-465 (2002) (termination payment
made to insurance agent not received for sale of capital assets).

The payments by the companies of contract value are subject
to the tax on self-employment income since they constitute net
earnings from self-employment.  We reach that conclusion because
contract value was determined based on the quantity (length of
service) and quality (final 6 months' earnings without reduction
for posttermination events) of the services rendered by
petitioner to the companies.  That establishes a nexus between
the contract value and petitioner's business of being a district
manager.  Petitioners argue that the agreement created a
franchise, which petitioner transferred back to the companies.
The agreement contains no language establishing a franchise, nor
do we believe that the agreement, which gives petitioner the
right to render personal services as a district manager,
establishes a franchise within the meaning of section
1253(b)(1).[2]  See Clark v. Commissioner, T.C. Memo. 1994-278
(implicitly rejecting the argument that a district manager with
Farmers Insurance Companies relinquished a franchise in

---

[2]  Sec. 1253(b)(1) provides:  "The term 'franchise' includes
an agreement which gives one of the parties to the agreement the
right to distribute, sell, or provide goods, services, or
facilities, within a specified area."

consideration of the payment of a contract value amount). Petitioners have failed to introduce evidence of vendible assets or show language referencing a contract of sale. That is sufficient for us to conclude that petitioner received no payment for any property. See Schelble v. Commissioner, T.C. Memo. 1996-269, affd. 130 F.3d 1388 (10th Cir. 1997). We reach the same conclusion that we reached in Farnsworth v. Commissioner, supra, also involving a district manager's agreement, that neither in form nor in substance did the cancellation of the agreement give rise to the sale of property by petitioner. See also Clark v. Commissioner, supra.

We sustain in full the deficiencies in tax determined by respondent.

Decision will be entered

for respondent.