118 T.C. No. 28


UNITED STATES TAX COURT



WARREN L. BAKER, JR. AND DORRIS J. BAKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 599-00.                    Filed May 29, 2002.



        P (husband) entered into "agents agreements"
(agreement) with State Farm Insurance Cos. (State Farm)
wherein P agreed to write insurance policies
exclusively for State Farm.  The agreement provided
that all property including information about policy
holders belonged to State Farm.  P's compensation was
based on a percentage of net premiums.  The agreement
also contained detailed provisions for termination.
P was entitled to a termination payment based on the
percentage of policies that either (1) remained in
force after termination or (2) were in force for the 12
months preceding termination.  P and State Farm did not
negotiate the terms of the agreement.

        P retired after approximately 34 years of
operating as an independent agent for State Farm.
Pursuant to the termination agreement P returned
account information, computers and the like to State
Farm and the successor agent.  P received a payment of
$38,622 in 1997 from State Farm pursuant to the
termination agreement.

Ps reported the payment on their 1997 Federal income tax return as a long-term capital gain. In a notice of deficiency issued to Ps, R disallowed capital gain treatment and determined that the payment was ordinary income. R did not impose self-employment tax on the income.

Held: P did not own a capital asset or sell a capital asset to State Farm, nor did the termination payment P received from State Farm represent payment for transfer of a capital asset to State Farm or the successor agent. Held, further, that Ps are not entitled to capital gain treatment for the termination payment received from State Farm in 1997. Held, further, Ps must treat the payment received in 1997 as ordinary income.

Thomas J. O'Rourke, for petitioners.

Roger W. Bracken, for respondent.

OPINION

DAWSON, Judge[1]: This case was assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(5) and Rules 180, 181, and 183.[2] The Court

---

[1] I wrote the Court's majority opinion in Jackson v. Commissioner, 108 T.C. 130 (1997), holding that termination payments received by the insurance agent from State Farm were not subject to self-employment tax under secs. 1401 and 1402, I.R.C. I also joined Judge Parr's concurring opinion indicating that such payments could be treated as being in the nature of a buyout of the agent's business. After further consideration, I am now persuaded by the opinion of Chief Special Trial Judge Panuthos that this petitioner (agent) is not entitled to capital gain treatment for the termination payment he received.

[2] Section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax
(continued...)

agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, Chief Special Trial Judge:  Respondent determined a deficiency in petitioners' Federal income tax of $2,519 for 1997.  All references to petitioner are to Warren L. Baker, Jr.

After a concession by petitioners,[3] the issue for decision is whether the termination payment received by petitioner upon retirement as an insurance agent of State Farm Insurance Cos. is taxable as capital gain or ordinary income.

Background

Some of the facts have been stipulated and are so found. The stipulated facts and the related exhibits are incorporated herein by this reference.  At the time of filing the petition, petitioners resided in Fairview Heights, Illinois.

I.  Petitioner's Agreement With State Farm

a.  General

Petitioner began his relationship with State Farm Insurance Cos. (State Farm) on January 19, 1963.  State Farm consisted of State Farm Mutual Automobile Insurance Co., State Farm Life

---

[2](...continued)
Court Rules of Practice and Procedure, unless otherwise indicated.

[3]  Petitioners concede that they failed to report dividend income of $919 from Magna Group, Inc.

Insurance Co., State Farm Fire & Casualty Co., and State Farm General Insurance Co.

Petitioner conducted his business as the Warren L. Baker Insurance Agency (the agency). He sold policies exclusively for State Farm. When he began his relationship with State Farm, he was not assigned customers. Instead, he developed a customer base. He selected the location of his office with State Farm's approval. He also hired and paid employees. He was responsible for paying the expenses of an office such as rent, utilities, telephones, and other equipment. He was obligated to establish a trust fund into which he deposited premiums collected on behalf of State Farm.

Petitioner entered into a series of contracts with State Farm known as agent's agreements. The agent's agreement at issue was executed on March 1, 1977. While the agreement contains approximately 6 pages, there are numerous attachments including schedules of payments, amendments, addenda, and memoranda that total 61 pages. The agreement was prepared by State Farm. Petitioner did not have the ability to change the terms of the agreement, but he had the option to refuse a new or revised agreement.

The preamble to the agreement reads, in part, as follows: "The Companies believe that agents operating as independent contractors are best able to provide the creative selling,

professional counseling, and prompt and skillful service essential to the creation and maintenance of successful multiple-line companies and agencies."

Section I of the agreement, Mutual Conditions and Duties, provides that petitioner was an independent contractor of State Farm. As a State Farm agent, petitioner agreed to write policies exclusively for State Farm, its affiliates, and government and industry groups. Paragraph C, section I of the agreement states that State Farm "will furnish you, without charge, manuals, forms, records, and such other materials and supplies as we may deem advisable to provide. All such property furnished by us shall remain the property of the Companies [State Farm]." Further, State Farm considered any and all information regarding policyholders to be its property, as follows:

> D. Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies acquired or coming into your possession during the effective period of this Agreement, or any prior Agreement, except information and records of policyholders insured by the Companies pursuant to any governmental or insurance industry plan or facility, are trade secrets wholly owned by the Companies. All forms and other materials, whether furnished by State Farm or purchased by you, upon which this information is recorded shall be the sole and exclusive property of the Companies.

Essentially, any data relating to a policyholder recorded by an agent on any paper was the property of State Farm.

Petitioner's compensation was based on a percentage of the net premiums. The compensation varied by the type of insurance, such as automobile and homeowner's. Petitioner was also assigned policies for which he received a smaller commission than those policies he personally produced. State Farm assigned existing policies to petitioner because the policyholders moved to the geographic location covered by his agency. Similarly, when policyholders covered by petitioner moved to a different geographic location, the policies were assigned to another agent in that geographic area. Petitioner did not compensate other agents for policies he assumed, and he did not receive payments for policies assigned to other agents.

The commissions payable for assigned policies are provided for in the schedule of payments attached to the agreement in relevant part as follows:

> an amount equal to 66-2/3 percent of the graded
> commission scale in Section I, provided, however, no
> commission shall be payable to you on any premium
> collections on business credited to your account from
> the account of an agent whose agreement with * * *
> [State Farm] has been terminated, or as a result of an
> agreement between an agent and * * * [State Farm]
> pursuant to the applicable paragraph of Section IV of *
> * * [an agreement], until a one-year period has elapsed
> following the date of such termination, except as
> provided for in paragraph IV-B-2 of this Schedule of
> Payments.

b.  Termination

Section III of the agreement addresses termination. Either party could terminate the agreement by written notice. The

agreement also provided for termination upon the death of petitioner. Within 10 days after termination of the agreement, "all property belonging to the Companies shall be returned or made available for return to the Companies or their authorized representative."

Petitioner was required to abide by a covenant not to compete for a period of 12 months following termination. The covenant not to compete provides as follows:

> E. For a period of one year following termination of this Agreement, you will not either personally or through any other person, agency, or organization (1) induce or advise any State Farm policyholder credited to your account at the date of termination to lapse, surrender, or cancel any State Farm insurance coverage or (2) solicit any such policyholder to purchase any insurance coverage competitive with the insurance coverages sold by the Companies.

Pursuant to section IV of the agreement, petitioner qualified for a termination payment if he met certain requirements. First, he must work for 2 or more continuous years as an agent. Second, within 10 days of termination, he must return or make available for return all property belonging to State Farm.

The amount of the termination payment payable is different for each of the State Farm companies. With two of the State Farm companies, the amount of the termination payment is based on a percentage of policies that either remained in force after

termination of the agreement or those that had been in force for
the 12 months preceding termination.[4]  The formulas for the
amount of termination payment are as follows:

> State Farm Mutual Automobile Insurance Company * * *
> the lesser of (1) or (2)-
>
> (1) twenty percent (20%) of the service compensation on
> "personally produced" policies, you earned under the
> Schedule of Payments for Other than Health Insurance
> Policies in the twelve (12) preceding months, or twenty
> percent (20%) of the service compensation on
> "personally produced" policies credited to your
> account, as of the date of termination, which remain in
> force in the same state, during the first twelve (12)
> months following the date of termination; whichever is
> greater, or
>
> (2) thirty percent (30%) of the service compensation on
> "personally produced" policies credited to your account
> as of the date of termination, which remain in force in
> the same state during the first twelve (12) months
> following the date of termination.
>
> State Farm Fire and Casualty Company and State Farm
> General Insurance Company * * * the lesser of (1) or
> (2)-
>
> (1) twenty percent (20%) of the commissions you were
> paid on "personally produced" policies for those lines
> of insurance * * * of the applicable Schedule of
> Payments, in the twelve (12) preceding months, or
> twenty percent (20%) of the commissions on "personally
> produced" renewal premiums you would have been paid
> under the applicable Schedule of Payments, if this
> Agreement had not been terminated, in the twelve (12)
> months following the date of termination on "personally
> produced" policies which remain in the same state, for
> those lines of insurance designated above and credited

---

[4]  It is not clear from the record whether the termination
payment that petitioner received was calculated based upon
policies that remained in force after termination or instead had
been in force for the 12 months preceding termination.  These
facts have no bearing on our decision.

to your account as of the date of termination;
whichever is greater, or

(2) thirty percent (30%) of the commissions on
"personally produced" renewal premiums you would have
been paid under the applicable Schedule of Payments, if
this Agreement had not been terminated, in the twelve
(12) months following the date of termination on those
"personally produced" policies designated in (1) and
credited to your account as of the date of termination.

State Farm Life Insurance Company-

An amount equal to the same compensation for the second
and subsequent policy years as would have been due and
payable to you for the first five years following the
date of termination on all State Farm life policies
personally written by you or assigned to you by the
Company for compensation, under the terms of the
applicable Schedule of Payments attached hereto, if
this Agreement had not been terminated.

State Farm and petitioner did not negotiate the amount or
conditions of the termination payment.  State Farm agreed to pay
petitioner a termination payment over either a 2- or 5-year
period.

Section V of the agreement provides for an extended
termination payment if petitioner worked for State Farm for at
least 20 years, of which 10 years were consecutive.  The extended
termination payment would begin 61 months after termination and
continue until petitioner's death.  The extended termination
payment is also based on policies personally produced by
petitioner during his last 12 months as an agent for State Farm.

State Farm paid commissions for new business personally
written by the agent as a percentage of the first policy year

premium due according to the percentage established in table I of the "Schedule of Payments Referred to in State Farm Agent's Agreement" (schedule of payments) attached to the agreement. For many of the policies, commissions would be paid during the first, second, third, fourth, and fifth policy year, depending upon the type of policy and its length. Section VI of the schedule of payments provides as follows:

> Upon termination of this Agreement by death or otherwise any unpaid compensation provided for under this Schedule of Payments then due and payable shall be paid as soon as ascertainable, and there shall be no further liability on the part of the Company under the terms of this Schedule of Payments.

During the operation of the agency and pursuant to the agreement, petitioner operated a trust fund. When petitioner terminated his relationship with State Farm, the trust account was closed and audited by State Farm.

## II.  Petitioner's Retirement

Petitioner retired and terminated his relationship with State Farm on February 28, 1997. At that time, he held approximately 4,000 existing policies generated from 1,800 households. Approximately 90 percent of the policies were assigned to one successor agent. The successor agent received reduced compensation (that is, a lower percentage) for the assigned policies.

Petitioner returned State Farm's property, such as policy and policyholder descriptions, which he gathered in master

folders that he purchased, claim draft books, rate books, agent's service texts, and a computer. He maintained much of the information regarding the policies and policyholders on the computer. He fully complied with the provision in the agreement for return of property to State Farm.

The successor agent hired the two employees previously employed by petitioner and assumed petitioner's telephone number. The successor agent also worked with petitioner on occasion prior to petitioner's retirement to meet policyholders and to ask questions. The successor agent opened an office in the vicinity of petitioner's office. When the termination was completed, petitioner had returned all of the assets used in the agency to State Farm and the successor agent.

III. Tax Return and Notice of Deficiency

Petitioners timely filed their 1997 Federal income tax return. They reported the income of $38,622 from the termination payment which petitioner received in 1997 as long-term capital gain on Schedule D, Capital Gains and Losses. Petitioners attached a two-page statement to Schedule D on which the termination payment was described as an annuity payable over 5 years.[5] The annuity was described as a sale of assets to State

---

[5] Timing of the recognition of income is not at issue. The record does not indicate how State Farm treated the termination payment on its return.

Farm that included "personally produced policies and other intangible assets".

Petitioners attached Form 8594, Asset Acquisition Statement Under Section 1060, to their tax return. On Form 8594, petitioners indicated the fair market value for the Class IV asset as $164,140.[6] Petitioners answered "yes" to the following question on line 6 of Form 8594: "did the buyer also purchase * * * a covenant not to compete?" Petitioners did not assign a value for the covenant not to compete.

In a notice of deficiency, respondent determined that the termination payment from State Farm was ordinary income and did not qualify for capital gain treatment.

## Discussion

### I. Positions of the Parties

Respondent argues that petitioner did not sell any property to State Farm because all of the property was owned by State Farm and reverted to State Farm when petitioner terminated his relationship with State Farm. Respondent contends that the agreement does not evidence a sale because the contract does not list a seller or purchaser. Respondent also argues that petitioners failed to establish that the termination payment represents proceeds from the sale of a business, business assets,

---

[6] A taxpayer may treat goodwill acquired before Feb. 14, 1997, as a Class IV asset. Sec. 1.1060-1T(a)(2)(ii), Temporary Income Tax Regs., 62 Fed. Reg. 2272 (Jan. 16, 1997).

or goodwill. Respondent also suggests that the termination payment is in the nature of income from self-employment, but hedges that position in arguing that the payment is "similar to an annuity" and a "retirement benefit". We note that respondent did not determine that petitioners were liable for self-employment tax with respect to the termination payment.

Petitioners argue that the termination payment was for the sale or buyout of a business resulting in capital gain. They assert that petitioner developed a customer base and the termination payment was designed to protect the existing customer base for the successor agent as well as compensate petitioner for the goodwill and going business concern he developed. Petitioners rely on the concurring opinion in Jackson v. Commissioner, 108 T.C. 130, 141 (1997), which characterizes a termination payment similar to the one at issue as a buyout of the taxpayer's business.

The Coalition of Exclusive Agent Associations, Inc. (CEAA), filed with leave of the Court an amicus brief pursuant to conditions specified in the Court's order. The CEAA's argument is similar to the arguments made by petitioners: State Farm purchased the goodwill generated by petitioner; therefore, petitioner is entitled to capital gain treatment.

## II. Evidentiary Issue

We first deal with an evidentiary issue presented at trial. Petitioners proffered a list of questions and answers dated February 14, 1991, which was marked for identification as Exhibit 12-P. The questions were prepared by a representative of respondent, and the answers were provided by a representative of State Farm. Respondent objected to the admission of the document and asked for an opportunity to authenticate the document. The Court admitted the document, although it was not admitted for the truth of the assertions contained therein. In a supplemental stipulation of facts the parties agreed that the State Farm representative who provided the answers to Exhibit 12-P, if called as a witness, would testify as set forth in a declaration attached to the supplemental stipulation as Exhibit 13-R. In the declaration the representative states that he provided the answers contained in Exhibit 12-P and further explains the answers set forth in Exhibit 12-P. Petitioners, however, object to the admission of Exhibit 13-R on the ground that State Farm's "view" of certain matters is not relevant. In this regard, the objection appears inconsistent with petitioners' proffer of Exhibit 12-P, which expresses the "view" or opinion of the same individual.

Considering Exhibits 12-P and 13-R together, we are satisfied that our initial ruling was correct and that Exhibit

12-P should not be admitted for the truth of the contents because it contains hearsay. To be consistent with our treatment of Exhibit 12-P, we admit Exhibit 13-R for the limited purpose of supplementing Exhibit 12-P but not for the truth of the assertions made therein. Fed. R. Evid. 401, 701, 801.

III. Burden of Proof

Generally the taxpayer bears the burden of proof. Rule 142(a)(1). Section 7491, which is effective with respect to court proceedings arising in connection with examinations by the Commissioner commencing after July 22, 1998, the date of its enactment by section 3001(a) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 726, does not apply to place the burden of proof on respondent. Petitioners have neither alleged that section 7491 is applicable nor established that they complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, maintain required records, and fully cooperate with respondent's reasonable requests.

IV. Sale or Exchange of a Capital Asset

We must decide the proper characterization of the termination payment made by State Farm to petitioner. We first consider whether petitioner owned a capital asset and whether petitioner sold or exchanged a capital asset for Federal income tax purposes. We also consider whether petitioner sold a

business to which goodwill attached.  If petitioner did not sell or exchange a capital asset, then the termination payment is taxable as ordinary income.

Long-term capital gain is defined as gain from the sale or exchange of a capital asset held for more than 1 year.  Sec. 1222(3).  A "capital asset" means property held by the taxpayer (whether or not connected with his trade or business) that is not covered by one of five specifically enumerated exclusions.  Sec. 1221.

In Schelble v. Commissioner, T.C. Memo. 1996-269, affd. 130 F.3d 1388 (10th Cir. 1997), we considered whether the taxpayer received gain from the sale or exchange of a capital asset. Pursuant to the terms of the agreement with the insurance company for which he was an agent, the taxpayer was required to return all records, manuals, materials, advertising, and supplies or other property of the company.  Id.  We concluded that there was no evidence of "vendible business assets", and the record did not support a finding of a sale of assets of a business.

The Court of Appeals in Schelble v. Commissioner, 130 F.3d at 1394, held that there was "no evidence in the record of vendible assets to support the sale of Mr. Schelble's insurance business".  It observed the following:

> By transferring policy records to * * * [the insurance
> company] pursuant to the Agreement, * * * [the
> taxpayer] maintains he transferred insurance business

goodwill developed by him.  * * * [The taxpayer] has failed, however, to show a sale of assets occurred.

Id.

In Foxe v. Commissioner, 53 T.C. 21, 26 (1969), we considered whether payments made to an insurance agent were made pursuant to the sale or exchange of a capital asset to his former insurance company upon the cancellation of his employment contract.  The taxpayer claimed that in the course of his business he built up "something of value, an organization" that the insurance company acquired.  Id.  Moreover, his personal contacts with customers, which were important to the insurance company, were "something of real value".  Id.

We concluded that even if the taxpayer had "built up an organization of value, it was not his to sell since * * * [the insurance company] under the contract owned all the property comprising such organization.  As to the customer contacts * * *.  They were not his to sell."  Id.  It was held that the taxpayer did not sell or exchange a capital asset, and the payments were taxable as ordinary income.

Section 1001(c) provides that gain is recognized upon the sale or exchange of property.  "The word 'sale' means 'a transfer of property for a fixed price in money or its equivalent'".  Schelble v. Commissioner, supra at 1394 (quoting Iowa v. McFarland, 110 U.S. 471, 478 (1885)); see also Commissioner v. Brown, 380 U.S. 563, 570 (1965).  "Exchange" means an exchange of

property for another property that is materially different either in kind or in extent.  Sec. 1.1001-1, Income Tax Regs.

The key to deciding whether there has been a sale for Federal income tax purposes is whether the benefits and burdens of ownership have passed.  Highland Farms, Inc. v. Commissioner, 106 T.C. 237 (1996); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).  Among the many factors we may consider in deciding whether there has been a sale are the following:  Whether legal title passes; how the parties treat the transaction; whether an equity was acquired in the property; whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; whether the right of possession is vested in the purchaser; which party pays the property taxes; which party bears the risk of loss or damage to the property; and which party receives the profits from the operation and sale of the property.  Levy v. Commissioner, 91 T.C. 838, 860 (1988); Grodt & McKay v. Commissioner, supra at 1237-1238.

Cases addressing whether there has been a sale or exchange of a capital asset often combine the issue of whether the taxpayer owned a capital asset with the issue of whether the taxpayer sold the asset.  For example, in Erickson v. Commissioner, T.C. Memo. 1992-585, affd. 1 F.3d 1231 (1st Cir. 1993), we concluded that there was no sale of the taxpayer's

assets to his former insurance company because there was nothing in the facts showing that there was a sale of "vendible tangible assets" of a business. In Erickson, the Court stated:

> [The taxpayers] maintain that * * * certain indicia of a sale exist. They assert that employees who formerly worked for * * * [the taxpayer] went over to Union Mutual and that all records, supplies, and equipment were turned over to Union Mutual. * * * however, the individuals who had worked with * * * [the taxpayer] had always been salaried employees of Union Mutual. * * * And by his own admission, * * * [the taxpayer] had owned very little in the way of supplies and equipment * * *

Id.

Respondent cites Jackson v. Commissioner, 108 T.C. 130 (1997), Milligan v. Commissioner, T.C. Memo. 1992-655, revd. 38 F.3d 1094 (9th Cir. 1994), and similar cases for the proposition that the taxpayer did not sell or exchange the assets in his business. These cases bear a factual resemblance to the case at hand in that the taxpayer, a former insurance agent, received a termination payment after the termination of his agreement with the insurance company. But these cases focus on whether the taxpayer was subject to self-employment tax under sections 1401 and 1402.

The holdings by the Court of Appeals in Milligan and by this Court in Jackson do not require a conclusion that the termination payment paid to petitioner represents proceeds from the sale or exchange of a capital asset. Both Jackson and Milligan left open the question of whether termination payments constitute the sale

or exchange of capital assets subject to capital gain treatment or whether they should be treated as ordinary income (other than income subject to self-employment tax).

V.    The Controlling Facts of This Case

We now apply the above discussion to the facts before us in this case.  Upon his retirement, petitioner returned all assets used in the daily course of business, including a computer, books and records, and customer lists to State Farm pursuant to the agreement.  Thus, much like the taxpayers in Foxe v. Commissioner, supra, and Schelble v. Commissioner, 130 F.3d 1388 (10th Cir. 1997), petitioner did not own these assets and, therefore, could not have sold them to State Farm.

Petitioner argues that the successor agent assumed his telephone number and hired the two employees of the agency, and that petitioner taught the successor agent about the agency and introduced him to policyholders, all of which support the argument that he sold the agency to State Farm.

The successor agent obtained the right to use the telephone number utilized by petitioner's agency.  Petitioner did not argue, and we do not conclude, that the telephone number was a capital asset in the hands of petitioner.  Additionally, there are no facts in the record that indicate that petitioner received any portion of the termination payment as payment for the successor agent's use of the telephone number.

There are no facts in the record that indicate that there was an employment contract between petitioner and the employees who worked for the agency or that the successor agent was required to hire the employees. Petitioner did not argue, and we do not conclude, that the employees constitute capital assets in the hands of petitioner. There is nothing in the record that indicates that petitioner received any portion of the termination payment as payment for the successor agent's hiring of the employees. The fact that the successor agent hired petitioner's former employees does not support petitioner's argument that he sold his agency.

Petitioner may have taught the successor agent about the agency and introduced him to policyholders when the successor agent visited petitioner's office, but there are no facts in the record that indicate that petitioner received the termination payment as payment for teaching the successor agent about the agency and introducing him to policyholders.

We conclude that petitioner did not own a capital asset that he could sell to State Farm. He did not receive the termination payment as payment for any asset. Accordingly, the termination payment does not represent gain from the sale or exchange of a capital asset.

Petitioner also argues that State Farm purchased goodwill. To qualify as the sale of goodwill, the taxpayer must demonstrate that he sold "'the business or a part of it, to which the goodwill attaches'". Schelble v. Commissioner, 130 F.3d at 1394 (quoting Elliott v. United States, 431 F.2d 1149, 1154 (10th Cir. 1970)). Goodwill is "the expectancy of continued patronage, for whatever reason." Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); see also VGS Corp. v. Commissioner, 68 T.C. 563, 590 (1977).

Nevertheless, because petitioner, for the reasons already explained, did not own and sell capital assets in his agency to State Farm, we conclude that petitioner did not sell goodwill.

VI. Nature of Ordinary Income

Respondent does not clearly explain his position as to the nature of the termination payment other than to argue that it is not taxable as capital gain. In the notice of deficiency, respondent determined that the termination payment was ordinary income. In his brief, respondent primarily argues that petitioners did not satisfy their burden of proof to establish that the termination payment was proceeds of a sale and thus subject to capital gain treatment.

Having concluded above that the termination payment was not received for the sale or exchange of a capital asset and is not entitled to treatment as a capital gain, we conclude that the

termination payment is taxable as ordinary income. Ordinary income treatment is accorded to a variety of payments. See, e.g., Hort v. Commissioner, 313 U.S. 28 (1941) (income received upon cancellation of lease derived from relinquishment of right to future rental payments in return for a present substitute payment and possession of premises); Elliott v. United States, supra (payment for termination of insurance agency contract was ordinary income); Foxe v. Commissioner, 53 T.C. at 25 (payment to insurance agent upon cancellation of employment contract was ordinary income); General Ins. Agency, Inc. v. Commissioner, T.C. Memo. 1967-143 (payment for agreement not to compete was ordinary income), affd. 401 F.2d 324 (4th Cir. 1968).

VII.  Covenant Not To Compete

An amount received for an agreement not to compete is generally taxable as ordinary income. Banc One Corp. v. Commissioner, 84 T.C. 476, 490 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987); Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21 (1985); Ullman v. Commissioner, 29 T.C. 129 (1957), affd. 264 F.2d 305 (2d Cir. 1959); General Ins. Agency, Inc. v. Commissioner, supra.

Petitioners reported the sale of a covenant not to compete on Form 8594 attached to the return. The agreement provides that, after retiring, petitioner would not solicit State Farm's policyholders for 1 year, or petitioner would forfeit the

termination payment.  If petitioner had competed against State Farm after retiring, he would not have received a termination payment.  We find that petitioner entered into a covenant not to compete with State Farm and that a portion of the termination payment was paid for the covenant not to compete.

Proceeds allocable to a covenant not to compete are properly classified as ordinary income.  See General Ins. Agency, Inc. v. Commissioner, 401 F.2d at 329.  Petitioner did not allocate any portion of the termination payment to the covenant not to compete, and it is unnecessary for us to make such an allocation because the termination payment is classified as ordinary income.

We have considered all arguments by the parties and amicus, and, to the extent not discussed above, conclude they are irrelevant or without merit.

To reflect the foregoing,

Decision will be

entered for respondent.