T.C. Memo. 2010-206

UNITED STATES TAX COURT

JAMES P. AND JOAN E. KENNEDY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2180-08.                    Filed September 22, 2010.

<u>Adam S. Fayne</u> and <u>Kathleen M. Lach</u>, for petitioners.

<u>Danielle R. Dold</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  James and Joan Kennedy (the Kennedys)
brought this action under section 6213(a)[1] to redetermine
deficiencies in income tax and penalties for the 2001 and 2002
tax years.  Any reference to "Kennedy" is to James Kennedy.  The

_____

[1]All section references are to the Internal Revenue Code in
effect for the years at issue.

respondent in this case is the Commissioner of Internal Revenue, whom we will refer to as the IRS.  In a deficiency notice, the IRS determined the following deficiencies and penalties:

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 2001 | $71,071 | $14,214 |
| 2002 | 11,240 | 2,248 |

The IRS now concedes (in its post-trial brief) that the deficiency notice contained computational errors.  The IRS asserts the following deficiencies and penalties instead of those determined in the deficiency notice:

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 2001 | $63,006 | $12,601 |
| 2002 | 10,318 | 2,064 |

The issues to be decided are:  (1) whether payments from Mack & Parker to Kennedy, in the amounts of $176,100 for 2001 and $32,758 for 2002, should be treated as ordinary income or the proceeds from the sale of a capital asset (we conclude that the payments are ordinary income), (2) whether the Kennedys are liable for self-employment tax under section 1401 on the same payments (we conclude that they are liable), and (3) whether the Kennedys are liable for the accuracy-related penalty under section 6662 for each of the tax years 2001 and 2002 (we conclude that they are not liable for the penalty).

FINDINGS OF FACT

The parties have stipulated some of the facts. These stipulated facts are adopted by the Court as factual findings. The Kennedys resided in Illinois at the time they filed their petition.

1. Before the 2000 Sale of KCG's Business

Kennedy formed a sole proprietorship in 1990 to engage in employee benefits consulting. An employee benefits consultant provides advice to an employer about the benefits that the employer offers to its employees. For example, the consultant gives advice on what types of benefits should be offered, how the benefits should be funded, and how the benefits should be priced. In 1995, Kennedy incorporated his employee benefits consulting business as a C corporation called KCG International, Inc. This corporation will be referred to here simply as KCG. From 1995 to 2006, Kennedy was KCG's sole shareholder. He was also its president. KCG was incorporated under the laws of Illinois.[2]

After its incorporation, KCG provided employee benefits consulting services to employers. KCG's revenue consisted of the consulting fees received from its clients. The clients did not have service contracts with KCG or with Kennedy.

---

[2]KCG was originally named KOG International, Inc.

KCG had only two full-time employees.[3]  These employees were Kennedy and Thomas Dolatowski.  Kennedy did not have an employment agreement with KCG.  Nor did he have a noncompetition agreement with KCG.

KCG's clients did business with KCG primarily because Kennedy worked for that company.  Kennedy commanded loyalty among the clients.  Kennedy attended all significant meetings with the clients.  Dolatowski had good relationships with KCG's clients, too.  Dolatowski also attended client meetings.

In the middle of the year 2000, Kennedy was approached by Edward E. Mack III.  Mack was the president of Mack & Parker, Inc., a company that was a subsidiary of Hub International, Ltd. Mack proposed that Kennedy join Mack & Parker.  Mack and Kennedy began negotiating the sale of the employee benefits consulting business.  Early in the negotiations, the two men contemplated that the price to be paid by Mack & Parker should be 150 percent of the predicted annual income to be generated from KCG clients, reduced by Dolatowski's base salary, with adjustments to reflect any changes in annual income over the next five years.  It was estimated that 150 percent of the annual income would amount to 150 percent of $440,000, or $660,000.  It was negotiated that the purchase price would be payable in installments with 40 percent of the purchase price to be paid at the closing, and that the 60

---

[3]More precisely, we know that at the time KCG was sold in 2000, it had two full-time employees.

percent balance would be paid periodically over the next five years.  It was only later in the negotiation process (at some time after September 8, 2000), that it was determined that a portion of the purchase price (25 percent) should be designated as payment for consulting services and that the remainder (75 percent) should be designated as payment for Kennedy's goodwill.

For legal advice on the transaction, Mack & Parker turned to attorney Jerry Roberts of the Chicago law firm of Fitzsimmons, Roberts & Paine.  In an email of September 1, 2000, Roberts asked Mack to confirm what the terms of the agreement would be. Roberts postulated that the terms would be as follows:

> Jim Kennedy has established an employee benefits consulting firm which has one additional professional employee (Tom [Dolatowski]) and one part time secretary and which operates out of offices with a month to month lease.  Tom is to be employed by M&P.  I assume the part time secretary is not to be employed by M&P.  The price to be paid to Jim for his business is 150% of some revenue figure (see discussion below) less the $48,000 base salary to be paid to Tom and adjusted for changes in revenue produced by the "book" of business over the five year payout period and any new business presented by Jim to M&P (we will have to carefully define what this means).  Forty percent of the purchase price is to be paid at closing with the balance to be paid in equal but adjusted installments over the next five years.

Roberts then made several suggestions about the transaction, and noted that he would need to consult a tax accountant, Philip Czajkowski, for tax advice: "I look to Phil for advise and as the tax treatment of the transaction and any preferences that he had

for structuring it to enhance the tax benefits." (Errors in original.)

Roberts consulted with Czajkowski. On September 8, 2000, Roberts wrote another email to Mack. Focusing on taxes, Roberts discussed different methods of structuring the purchase of the employee benefits consulting business. Roberts observed that if the transaction were structured as an asset purchase (i.e., if Mack & Parker bought the assets of KCG rather than buying KCG stock), then the payment would be taxed twice. First, KCG would recognize capital gains income. Second, Kennedy would recognize income when KCG distributed the proceeds to Kennedy. Roberts observed that if the transaction were instead structured as a purchase by Mack & Parker of KCG's stock, there would be only one level of tax: Kennedy would pay tax at capital gains rates on the payment for the stock. The disadvantage of a stock sale was that Mack & Parker would not be able to claim amortization deductions. Finally, Roberts explained to Mack that Czajkowski had suggested that "M&P could take the position that Kennedy owns KCG's customer list and the good will with the customers and hence could sell them directly to M&P." Roberts observed that this structure--which is a variation of an asset purchase--would have advantages. Kennedy would be taxed only once (at capital gains rates, presumably). Mack & Parker could amortize the cost

of the assets over 15 years.  Czajkowski's suggested structure would be reflected in the final transactional documents.

On October 20, 2000, Roberts wrote an email to Mack describing draft transactional documents that, if executed, would effect the sale of KCG's business.  Roberts noted that these documents would allocate 75 percent of the purchase price to Kennedy's "goodwill" and the remaining 25 percent to consulting services that would be provided by Kennedy through KCG.  This is the first document in the record to reflect this 75/25-percent split of the purchase price between goodwill and services.  It was an allocation that would be reflected in the final transactional documents.

Kennedy's longtime accountant was James Vourvoulias.  A certified public accountant, Vourvoulias had prepared the income-tax returns for the Kennedys and KCG for several years.  Shortly before the sale was consummated, Vourvoulias attended one large "due diligence" meeting between Kennedy and Mack & Parker employees.

2.    The 2000 Sale Transaction

On October 31, 2000, Mack & Parker purchased the employee benefits consulting business of KCG.  The sale was effected by three contracts:  (1) the Agreement for Assignment of Know-How and Goodwill ("the Goodwill Agreement"), (2) the Asset Purchase Agreement, and (3) the Consulting Agreement.  The three

agreements were functionally interdependent, and were expressly made contingent on each other. The major obligations required by the agreements are summarized in the table below. (The arrows in the table point from the party who was burdened by a particular obligation; the arrows point to the party who benefited from the obligation). "M&P" refers to Mack & Parker.

### Goodwill Agreement

| | |
|---|---|
| Five years of payments to Kennedy | M&P --> Kennedy |
| Relationships with KCG clients | M&P <-- Kennedy |
| Know-how regarding benefits consulting | M&P <-- Kennedy |
| Will not compete with M&P until 12/31/07 | M&P <-- Kennedy |

### Consulting Agreement

| | |
|---|---|
| Five years of payments to KCG | M&P --> KCG |
| Five years of services | M&P <-- KCG |
| Five years of services (through KCG) | M&P <-- Kennedy |
| Will not compete with M&P until 12/31/07 | M&P <-- KCG |
| Will not compete with M&P until 12/31/07 | M&P <-- Kennedy |

### Asset Purchase Agreement

| | |
|---|---|
| $10,000 payment | M&P --> KCG |
| Customer lists and relationships, data, name | M&P <-- KCG |
| Will not compete with M&P until 12/31/07 | M&P <-- KCG |

a. The Goodwill Agreement

The parties to the Goodwill Agreement were Kennedy and Mack & Parker. Kennedy had three major obligations under the Goodwill Agreement. First, Kennedy agreed to "[convey]" to Mack & Parker his "special personal relationships" with 46 clients (all of whom were listed in exhibit A to the agreement), as well as the "personal goodwill" incident to those relationships. Second, Kennedy agreed to "[convey]" to Mack & Parker his "know-how"

relating to the business of employee benefits consulting.  Third, Kennedy was prohibited from engaging in employee benefits consulting until December 31, 2007, except that he could consult on behalf of Mack & Parker.

The Goodwill Agreement obligated Mack & Parker to make a series of payments to Kennedy.  The first payment was a flat sum of $176,100, to be paid on January 2, 2001.  Five other payments were required to be made in February 2002, February 2003, February 2004, February 2005, and February 2006, respectively.  The amounts of these five payments were determined by formulas.  Under these formulas, each payment amount depended on the amounts that would be collected by Mack & Parker from "Kennedy clients" during the 5-year period after the execution of the agreement.  This period, from November 1, 2000, to December 31, 2005, was divided into five subperiods for purposes of the formulas.  The first period comprised November 1, 2000, to December 31, 2001.  The second, third, fourth, and fifth periods were the calendar years 2002, 2003, 2004, and 2005, respectively.  "Kennedy clients" were defined in the agreement as clients that KCG had served in the two-year period before the agreement and any clients introduced to Mack & Parker by KCG or Kennedy.

The formulas were written so that each payment could turn out to be a negative number.  A payment amount would be negative if the amounts collected by Mack & Parker from the Kennedy clients

during the relevant subperiod were relatively low.  The effect of a negative payment was that the payment flow would be reversed: instead of Mack & Parker making the payment to Kennedy, Kennedy would be required to make the payment to Mack & Parker.[4]

Attached to the Goodwill Agreement was a table that illustrated how the payment formulas worked in various situations. If actual revenues from Kennedy clients were $440,000 in each of the five subperiods, the total payments to Kennedy (the sum of all six payments, including the initial payment) would be $451,500. If actual revenues were $440,000 in the first period and increased $20,000 in each succeeding year, the total payments to Kennedy would increase to $519,000.  If actual revenues started at $440,000 in the first period and then decreased $20,000 for each succeeding year, then Kennedy would receive $364,000 in total payments.

b.   The Consulting Agreement

The Consulting Agreement obligated Mack & Parker to make a series of payments to KCG.  The first payment was a flat sum of $58,700 to be paid on October 31, 2000.  Five other payments were required to be made in February 2002, February 2003, February 2004, February 2005, and February 2006, respectively.  The amounts of these five payments depended on the amounts collected by Mack & Parker from "KCG clients" during the period from November 1, 2000,

---

[4]For example, if the formula produced the number -$100,000, Kennedy would be required to pay Mack & Parker $100,000.

to December 31, 2005. "KCG clients" were defined as clients that KCG had served in the two-year period before the agreement, and any clients introduced to Mack & Parker by KCG or Kennedy. If the amounts collected were low enough, the payment amounts could be negative. If the amounts were negative, then KCG would be required to pay Mack & Parker the amounts.

A table that illustrated the calculation of the payment amounts was attached to the agreement. If actual revenue was $440,000 in each of the five periods, the total payment to KCG (i.e. the sum of all six payments) would be $150,500. If actual revenue started at $440,000 and increased $20,000 for each succeeding year, then the total payment to KCG would increase to $173,000. If actual revenue started at $440,000 and decreased $20,000 for each succeeding year, then KCG would receive $128,000 in total payments.

Under the Consulting Agreement, KCG obligated itself to provide consulting and advisory services to Mack & Parker from October 31, 2000, to December 31, 2005. The services expressly included (1) transferring to Mack & Parker the know-how of the benefits consulting business possessed by Kennedy and KCG, (2) assisting in the transition of existing KCG clients to Mack & Parker, and (3) cultivating new clients and business for the benefit of Mack & Parker. Kennedy agreed to provide the services as an employee of KCG. KCG also agreed to "cause Kennedy to

devote such time, attention, knowledge and skill to the business and interests of M&P as may be reasonably requested". The agreement expired December 31, 2005. Kennedy and KCG agreed that during the term of the agreement they would not render employee benefits consulting services, except on behalf of Mack & Parker. They also agreed not to render any employee benefits consulting services for two years after the term of the agreement without the written consent of Mack & Parker.

c. The Asset Purchase Agreement

Under the Asset Purchase agreement, Mack & Parker agreed to pay KCG $10,000. The payment was due on October 31, 2000. In exchange, KCG agreed to convey to Mack & Parker all the customer relationships of KCG's business of providing employee benefits consulting services. The customer relationships to be transferred were expressly limited to the relationships with 46 customers listed in exhibit 1.1.2 of the Asset Purchase Agreement. This list of 46 customers is identical to the list attached to the Goodwill Agreement. KCG also agreed to convey to Mack & Parker all computer data used in the operation of its business, all "going concern value", all customer files, all customer lists and other customer-based intangibles, the name "KCG International, Inc.", and KCG's telephone number. Cash and furniture were not conveyed. KCG agreed that neither it nor its employees would

render employee benefits consulting services through December 31, 2007, except on behalf of Mack & Parker.

   d.   <u>Some Additional Aspects of All Three Agreements</u>

As explained earlier, the Asset Purchase Agreement required KCG to convey its relationships with 46 clients.  The Goodwill Agreement required Kennedy to convey his personal relationships with the same 46 clients.  Almost all of these 46 employers had been clients of Kennedy before 1995, when he incorporated his consulting business.  Thus, only a few became clients after 1995.

The payments required of Mack & Parker under the agreements can be classified into three types:  (1) a flat $10,000 payment to KCG, which was required by, and attributed to, the Asset Purchase Agreement, (2) payments to KCG, which were required by, and allocated to, the Consulting Agreement, and (3) payments to Kennedy, which were required by, and allocated to the Goodwill Agreement.  The last two types of payments were estimated to be $58,700 and $176,100, respectively.  The ratio between these two amounts is 25/75.

All three agreements imposed on Kennedy an obligation not to compete with Mack & Parker in the area of employee benefits consulting.  These covenants were extremely valuable to Mack & Parker.  The covenants barred Kennedy from competing with Mack & Parker for the 46 KCG clients.  They also provided an incentive

for Kennedy to work with Mack & Parker, for he would have no other way of earning a living from employee benefits consulting.

The payments due to Kennedy under the Goodwill Agreement, and to KCG under the Consulting Agreement, depended on the amounts Mack & Parker received from KCG's former clients. Therefore, Kennedy had an incentive to work to ensure that KCG's former clients continued to do business with Mack & Parker.

3. <u>After the Sale</u>

The three agreements that effected the sale were executed on October 31, 2000. Around November 1, 2000, Kennedy sent a letter to the KCG clients explaining that KCG was joining Mack & Parker. Kennedy stated: "This move will also mark the beginning of a 'five-year plan' for my retirement on December 31, 2005." The letter continued:

> The primary motivation for this change is to increase our employee benefits consulting staff so that Tom Dolatowski and I can address your consulting needs more efficiently and in a cost effective manner. * * *

Kennedy began work at Mack & Parker. He was given a cubicle, a computer, business cards, and the title "Consulting Practice Director". Dolatowski, another former employee of KCG, was appointed head of a new Mack & Parker unit serving the KCG clients. However, he quit work at Mack & Parker after two months. As a result of Dolatowski's departure, Kennedy devoted more time to Mack & Parker than he had expected he would at the time of the sale. During the first year after the sale transaction, 46

percent of Mack & Parker's revenue was traceable to time directly billed from Kennedy's personal billable time. Kennedy did not receive any compensation from Mack & Parker other than the payments that Mack & Parker was required to make under the 2000 sale transaction. Kennedy did not receive wages.

Kennedy became convinced that he was undercompensated. Although Kennedy was barred by his non-competition obligations from forming his own consulting business, he would have been permitted to work in an area other than employee benefits consulting. In November 2001, Kennedy informed Mack that he had been working full-time since joining Mack & Parker, that he thought he was undercompensated for his work, and that he would leave Mack & Parker unless his compensation was increased. Mack & Parker reached an employment agreement with Kennedy. Kennedy began work for Mack & Parker under the new arrangement in May 2002. When this case went to trial, Kennedy was still an employee of Mack & Parker. After Kennedy began receiving wages as an employee of Mack & Parker, he continued to receive payments under the Goodwill Agreement. The record does not reveal whether KCG continued to receive payments under the Consulting Agreement.

KCG continued its existence as a corporation after the sale of its assets. In December 2000, KCG changed its name to JK Partners, Inc. This name change was necessitated by the Asset Purchase Agreement, which transferred the ownership of the name

KCG International, Inc. to Mack & Parker. KCG was finally dissolved in 2006.

On April 24, 2001, nearly six months after the sale, Mack & Parker issued a press release announcing the acquisition of KCG. The press release said: "Mr. Kennedy will continue to manage the consulting services provided to KCG clients from the offices of Mack and Parker in Chicago, Illinois."

On October 31, 2000, Mack & Parker made two payments to KCG. The first payment, in the amount of $10,000, was required by the Asset Purchase Agreement. The second payment, in the amount of $58,700, was required by the Consulting Agreement.

The Kennedys did not report any income from a trade or business on a Schedule C, Profit or Loss From Business, of their joint income-tax return for 2000.

During 2001, Kennedy received $176,100 from Mack & Parker. On their 2001 joint income-tax return, the Kennedys reported that Kennedy received the $176,100 as proceeds on the sale of the goodwill and the client list of KCG. They recorded that the basis in these two assets was zero. The resulting $176,100 in long-term capital gain was offset with $173,658 of capital losses that were unrelated to the sale of the consulting business.

During 2002, Kennedy received $32,757.94 from Mack & Parker. As with the payment he received in 2001, the Kennedys reported on their 2002 joint income-tax return that Kennedy received the

payment as the proceeds from the sale of the goodwill and the client list of KCG. They reported that the basis in these two assets was zero. The resulting $32,759 in long-term capital gain reported on the 2001 return was completely offset with $157,621 of capital losses unrelated to the sale of the consulting businesses.

Vourvoulias prepared the 2001 and 2002 returns for the Kennedys. Kennedy expected Vourvoulias to advise him if the tax return was incorrect.

Mack & Parker made payments to Kennedy of $71,508 in 2003, $64,112 in 2004, $40,300 in 2005, $76,764 in 2006. As they had in 2001 and 2002, the Kennedys reported on each income-tax return for years 2003-2006 that the payments were gross proceeds from the sale of goodwill and the client list of KCG. They reported the resulting gain as long-term capital gain. On their 2003, 2004, and 2005 returns, the capital gain they reported was entirely offset by capital losses. On their 2006 return, the $76,764 reported as capital gain from the sale of goodwill and the client list was only partially offset by capital losses: i.e. after accounting for a $8,467 capital loss from the dissolution of JK Partners and accounting for a combined capital loss of $56,770 resulting from various unrelated capital gains and losses, the Kennedys recognized long-term capital gain of $11,528.

As discussed above, the IRS mailed a deficiency notice to the Kennedys for the tax years 2001 and 2002. The payments that

Kennedy received in 2001 and 2002, in the amounts of $176,100 and $32,758, respectively, and reported as income from the sale of capital assets, were recharacterized by the IRS as ordinary income. As a result, the IRS determined that the Kennedys owed deficiencies in income tax, and accuracy-related penalties. In its post-trial brief, the IRS has conceded some of the amounts of the deficiencies and corresponding penalties.

OPINION

1. Evidentiary Issues

We initially address some evidentiary issues that have not been resolved. During trial, the respondent (i.e. the IRS) moved for the admission of the following documents: Exhibits 20-R, 21-R, 32-R, 33-R, 41-R, 42-R, and 43-R. The Kennedys objected on relevancy and hearsay grounds. The Court immediately overruled the relevancy objections but reserved its ruling on the validity of the hearsay objections. At no point did the IRS attempt to build a foundation to defeat the hearsay objections. We now determine that the hearsay objections are valid. The documents will therefore be excluded from evidence.

2. Capital Gain Versus Ordinary Income Treatment of the Payments From Mack & Parker

The Kennedys take the position that the payments Kennedy received from Mack & Parker are given capital treatment, because, they argue, the payments are the proceeds from the sale of goodwill. Goodwill is a type of property. McCubbin v. McCubbin,

465 N.E.2d 672, 674 (Ill. App. Ct. 1984). It represents "the personal relationships and customer contacts which the owner of the business has been able to develop." Id.[5] The IRS makes several arguments why the payments to Kennedy should not be considered payments for goodwill. First, the IRS argues that the owner of the customer list was not Kennedy, but KCG. Without the customer list, the IRS contends, Kennedy could not transfer goodwill.

Second, the IRS argues that the Kennedys have failed to prove that Kennedy owned a goodwill asset. The IRS notes, for example, that the Kennedys provided the Court no appraisal of the goodwill asset that Kennedy supposedly owned before the 2000 sale. It notes furthermore that Kennedy did not have any contracts with any clients, and thus the Kennedys cannot rely on such contracts as proof of the existence of a goodwill asset.

Third, the IRS contends that even if Kennedy had owned the goodwill asset before the 2000 sale, this asset should not be considered a vendible asset. Any goodwill asset would be based upon the value of Kennedy's relationships with his customers. These relationships, the IRS maintains, had no value unless Kennedy continued to perform services to the clients.

_____

[5]The term carries a similar meaning in the context of the federal income tax. Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555-556 (1993); sec. 1.1060-1(b)(2)(ii), Income Tax Regs. (effective generally for any asset acquisition occurring after Mar. 15, 2001).

The IRS also argues that Kennedy could not have sold goodwill because he did not own the employee benefits consulting business before the 2000 sale. The IRS maintains that the business was owned by KCG, the company that employed Kennedy. In support of its contention that Kennedy could not sell goodwill without owning the underlying business, the IRS cites Baker v. Commissioner, 338 F.3d 789 (7th Cir. 2003), affg. 118 T.C. 452 (2002).[6]

Finally, the IRS asserts the substance-over-form doctrine requires that the payments from Mack & Parker be considered either payments for Kennedy's services, or payments for Kennedy's promise not to compete, or both. The IRS justifies its substance-over-form argument by the following facts:

- The sale of the consulting business was structured to minimize taxes (in that the parties attempted to characterize

_____

[6]In Baker v. Commissioner, 338 F.3d 789, 791 (7th Cir. 2003), affg. 118 T.C. 452 (2002), Baker was an insurance agent for the State Farm Insurance Company. Under his agreement with State Farm, all records regarding policyholders were the property of State Farm. Id. The agreement further provided that upon his retirement, Baker would be entitled to a termination payment, the amount of which would be determined by the number of policies in effect at the time of retirement. Id. at 792. Upon Baker's retirement in 1997, he received the termination payment of more than $38,000. He claimed that the payment was in consideration for goodwill and that therefore it should be considered long-term capital gain income. Id. at 792-793; 118 T.C. at 460. The Tax Court rejected the argument that the payment was for goodwill. 118 T.C. at 465. The Tax Court observed the principle that a person can sell goodwill only when that person has also sold the business to which the goodwill attaches. Id. Holding that Baker was not the owner of the assets of the insurance agency business, the Tax Court determined that Baker did not sell goodwill. Id. Employing similar reasoning, Court of Appeals for the Seventh Circuit affirmed the Tax Court's decision. 338 F.3d at 793.

the payments as payments for a capital asset);

•the Consulting Agreement required Kennedy to provide future services to Mack & Parker;

•Kennedy indeed performed substantial services for Mack & Parker;

•KCG's clients would not have switched to Mack & Parker unless Kennedy worked for Mack & Parker;

•emails sent by Kennedy after he began work at Mack & Parker implied that he considered the payments to be compensation for his services; and

•Kennedy's covenant not to compete was valuable.

The Kennedys rejoin that Martin Ice Cream Co. v. Commissioner, 110 T.C. 189 (1998), compels the conclusion that Kennedy owned a goodwill asset and that the payments he received from Mack & Parker were to purchase that asset.  The Kennedys also argue that KCG could not have been the owner of the goodwill associated with the client relationships because Kennedy did not have a non-compete agreement with KCG.

We agree with the IRS that Kennedy did not sell a goodwill property to Mack & Parker.  Our reasoning--set forth below--is not necessarily the same reasoning as the IRS's.  "Whether goodwill does exist as a capital asset of a sole proprietor and if so whether such goodwill was transferred are questions of fact in each case."  Butler v. Commissioner, 46 T.C. 280, 287 (1966).  A

taxpayer has the burden of proving facts in a tax dispute with the federal government.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Thus, the Kennedys have the burden of proving that the payments Kennedy received from Mack & Parker were payments for his goodwill asset.  Section 7491(a) places the burden of proof on the IRS if a taxpayer produces credible evidence with respect to a factual issue and meets other conditions.  Among these conditions is, first, that the taxpayer met all substantiation requirements.  Second, the taxpayer must have maintained all required records and complied with the IRS's requests for information.  The Kennedys do not contend that they meet these requirements.  It is therefore inappropriate to shift the burden of proof to the IRS.

Before Kennedy sold the consulting business to Mack & Parker in 2000, he had developed a loyal following among his clients.  In order for Mack & Parker to benefit from Kennedy's reputation, it needed to employ his services.  This alone does not mean that the money Mack & Parker paid to Kennedy should be considered payments for services.  A payment to someone who provides ongoing services can be considered a payment for goodwill.  This proposition was established by Horton v. Commissioner, 13 T.C. 143, 145, 149 (1949) (five years of payments promised to a solo practitioner CPA upon joining an accounting partnership--payments that were equal to 10 percent of the fees collected by the partnership from

clients in the city of the CPA's former practice--were considered to be half for the CPA's pre-existing goodwill and half for the CPA's covenant not to compete with the partnership), Wyler v. Commissioner, 14 T.C. 1251, 1260 (1950) ($50,000 lump-sum payment received by a solo practitioner CPA upon joining an accounting firm--a payment that was additional to yearly $10,000 payments denominated as "salary"--was considered a payment for goodwill) and Watson v. Commissioner, 35 T.C. 203, 208 (1960) (lump-sum payment to solo practitioner CPA who joined two new partners in an accounting partnership--a payment that was equal to the gross annual receipts of the CPA's practice--was payment for goodwill).

Even though a payment to a service provider can be considered a payment for goodwill in certain circumstances, we are convinced that the payments to Kennedy were consideration for services rather than goodwill. We find it significant that there is a lack of economic reality to the contractual allocation of the payments to goodwill. In other cases, the contractual allocation of a portion of a payment to goodwill has been important in determining that the payment was indeed for goodwill. In those other cases, the contractual allocation appeared to genuinely reflect the relative value of the seller's customer relationships compared to the value of the seller's ongoing personal services.[7] Here,

---

[7]An example is Wyler v. Commissioner, 14 T.C. 1251 (1950). The taxpayer was a certified public accountant who had originally practiced with five employees and no partners. Id. at 1252. His

however, the allocation of 75 percent of the total consideration paid by Mack & Parker to goodwill was a tax-motivated afterthought that occurred late in the negotiations. An initial issue that was resolved by the parties to the transaction was the amount that Kennedy should receive from Mack & Parker. This amount was initially estimated to be $660,000 minus Dolatowski's base salary. The amount of the payment was to be adjusted over five years to reflect the degree of success Kennedy had in integrating KCG's clients into the Mack & Parker fold. But the decision to allocate 75 percent of the total payments to goodwill appears not to be

---

practice was therefore a sole proprietorship, one which operated under the name Richard S. Wyler & Co. Id. In 1944 the taxpayer joined the partnership of Peat, Marwick, Mitchell & Co. Id. at 1254. Peat Marwick agreed that it would pay the taxpayer $50,000 in cash in "consideration of the transfer of good will" by the taxpayer to Peat Marwick. Id. at 1255. The taxpayer was also to be paid a "salary" of $10,000 per year during the term of the agreement, which was a 3-1/2-year period from Feb. 7, 1944, to June 30, 1947. Id. at 1254-1255. The taxpayer was also to be paid "additional compensation" during the term of the agreement. Id. at 1256. The "additional compensation" was equal to 1 percent of the profits of the Peat Marwick firm. Id. at 1255-1256. The additional compensation would never be less than $10,000 per year. Id. The amount of additional compensation for the last year of the agreement was to be reduced by *1/4 ($200,000-R)*, where *R* is equal to the gross fees received by Peat Marwick from the taxpayer's former clients over the 3-1/2-year term of the agreement. Id. at 1256. The amount of the reduction could not exceed the additional compensation that would have otherwise been payable for the last year. Id. The Tax Court held that the taxpayer had possessed vendible good will before the agreement with Peat Marwick, and that the $50,000 payment was in exchange for goodwill. Id. at 1260. In making the later finding, the Court relied on the agreement and on an interoffice memorandum by a Peat Marwick partner that claimed that the $50,000 payment was for taxpayer's "practice". Id.

grounded in any business reality.  It did not reflect the value of goodwill in relation to the other valuable aspects of the transaction, such as the services to be performed by Kennedy for Mack & Parker.  Rather, the 75 percent allocation was driven by a desire to minimize taxes.

Setting aside that the contracts allocated 75 percent of the consideration for the sale to goodwill, the record reveals that Kennedy undertook to work for Mack & Parker for five years until his planned retirement date of December 31, 2005, that he gave Mack & Parker the valuable promise not to compete in the area of employee benefits consulting, and that he worked for Mack & Parker for 18 months without compensation for his services (other than relatively meager amounts paid to KCG under the terms of the Consulting Agreement).  Under these circumstances, we find that the payments Kennedy received were not payments for goodwill.

Having determined that the payments were not for Kennedy's goodwill, we now turn to the question of what the payments were for.  As the respondent contends, the payments were for one of two things:  (1) Services to be performed by Kennedy, and (2) Kennedy's promise not to compete with Mack & Parker.  Payments for services are includable in ordinary income.  Sec. 61(a)(1).  Payments for an agreement not to compete are also includable in ordinary income.  See Baker v. Commissioner, 338 F.3d at 794.  Consequently we need not allocate the payments between services

and noncompetition obligations.  See <u>Baker v. Commissioner</u>, 118 T.C. at 466-467.  The payments are includable in ordinary income.

The Kennedys' legal case relies primarily on <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. 189 (1998).  Their brief states:

> it is clear from Martin Ice Cream * * * that Mr.
> Kennedy did own this capital asset, the know-how and
> goodwill.  The Payments were directed to the payment
> of know-how and goodwill. * * *

We disagree that <u>Martin Ice Cream Co.</u> determines the outcome here, and we explain why.  Martin Ice Cream Co. was a corporation that distributed ice cream to both supermarkets and small stores.  <u>Id.</u> at 196.  It was the first distributor of Häagen-Dazs ice cream. <u>Id.</u> at 193.  Arnold Strassberg was an officer of Martin Ice Cream. He also owned 51 percent of Martin Ice Cream Co.  <u>Id.</u> at 192.  He concentrated his efforts on the supermarket business as opposed to the small-store business.  <u>Id.</u> at 194.  As a result, Strassberg had valuable relationships with supermarkets.  <u>Id.</u> at 195-196.  On May 31, 1988, SIC was formed as a wholly owned subsidiary of Martin Ice Cream Co.  <u>Id.</u> at 198.  On June 15, 1988, Martin Ice Cream Co. transferred to SIC its rights to distribute ice cream to supermarkets.  <u>Id.</u> at 200.  On the same day, Arnold exchanged his stock in Martin Ice Cream for the stock of SIC.  <u>Id.</u>  Then, on July 22, 1988, SIC and Strassberg transferred to Häagen-Dazs the right to distribute ice cream to supermarkets.  <u>Id.</u> at 202-203. SIC and Strassberg also transferred SIC's business records, customer records, and associated goodwill.  <u>Id.</u> at 204.  In

exchange, Strassberg and SIC received $1,430,340.  Id. at 206.

Strassberg concurrently signed a consulting and non competition

agreement with Häagen-Dazs, for which he was paid $150,000 per

year for 3 years.  Id. at 204.  SIC's tax return for 1988 reported

that it had sold the assets and that because it was an S

corporation, with only one shareholder at the end of the tax year

(Strassberg), Strassberg would be taxed on the gain.  Id. at 205.

The IRS took the position that the true seller of the assets was

Martin Ice Cream Co., and that therefore Martin Ice Cream Co.

should recognize the gain.  Id. at 206.  The Tax Court found that

the owner of the assets--until the sale to Häagen Dazs on July 22,

1988--was Strassberg.  Id.  The Court reasoned that Strassberg

never entered into an agreement with Martin Ice Cream Co. under

which his relationships became property of Martin Ice Cream Co.

It held that the customer relationships of Strassberg were a

"personal [asset] entirely distinct from the intangible corporate

asset of corporate goodwill."  Id. at 207.  Martin Ice Cream Co.

is not dispositive here.  Martin Ice Cream Co. held that a

corporation (Martin Ice Cream Co.) was not taxable on payments

that were made to Strassberg, the corporation's controlling

shareholder, for his customer relationships.  But the Court in

Martin Ice Cream Co. had no occasion to address how the

shareholder should be taxed on the payments, inasmuch as the

shareholder had no case before the Court.  Therefore, the Court

was not called to opine on whether the payments should be treated as payments for services or payments for a capital asset.

3.  The Kennedys' Liability for Self-Employment Tax Under Section 1401 on the Payments Received From Mack & Parker

The IRS determined that the payments of $176,100 in 2001 and $32,758 in 2002 should be included in Kennedy's self-employment income. The Kennedys respond that the payments are not includable in self-employment income because the payments are not ordinary income. Having already rejected this argument, we conclude that the payments are includable in self-employment income.

4.  The Accuracy-Related Penalty Under Section 6662(a)

The IRS determined that the Kennedys were liable for the section accuracy-related penalty for the tax years 2001 and 2002. Section 6662(a) and (b)(2) imposes a penalty equal to 20 percent of the portion of the underpayment of tax attributable to any substantial understatement of income tax. A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Pursuant to section 7491(c), the IRS bears the burden of producing sufficient evidence showing the imposition of a penalty is appropriate in a given case. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the IRS meets this burden, the taxpayer must come forward with persuasive evidence that the penalty is inappropriate. Id. at 447.

The Kennedys' returns for 2001 and 2002 erroneously reported the payments from Mack & Parker to Kennedy (in the amounts of $176,100 and $32,758, respectively) as proceeds from the sale of a capital asset rather than as ordinary income. This erroneous treatment resulted in the returns' showing an understatement of tax for each year at issue. The understatement for each year greatly exceeds $5,000 and 10 percent of the tax required to be shown on the return.

The IRS also argues that the accuracy-related penalty is justified because the Kennedys' capital gains treatment was attributable to negligence. Sec. 6662(c). However, we find that the accuracy-related penalty should not be imposed because the Kennedys had reasonable cause for the tax treatment and acted in good faith. Sec. 6664(c). Reliance on a tax opinion provided by a professional tax adviser may serve as a basis for the reasonable-cause-and-good-faith exception to the accuracy-related penalty. Sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to rely reasonably upon advice of a tax adviser, the taxpayer must at a minimum prove by a preponderance of the evidence that: (1) the adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221

(3d Cir. 2002).  We find that Kennedy did indeed rely on Vourvoulias to prepare the return accurately, that Kennedy provided to Vourvoulias the relevant documents underlying the 2000 sale transaction, and that Vourvoulias concluded that the transaction should be considered a capital transaction.  We further find--considering his background and experience--that Vourvoulias was a sufficiently reliable tax adviser.  Under the facts of the case, Kennedy has demonstrated reasonable reliance on the advice of a professional.  The Kennedys should therefore not be subject to the accuracy-related penalty for the years at issue.

<u>An appropriate decision</u>

<u>will be entered</u>.